Mr. Justice STORY
 

 delivered the opinion of the court.
 

 - This is the case of an appeal from the decree of the Circuit Court of the district of Ohio, sitting in equity,- — rendered in favour of the original plaintiff, and it. is brought to this court by the original- defendants* who are how the appellants. ■ The record is exceedingly. ' voluminous, and the facts and; proceedings complicated and perplexed by a variety of details. A" general outline of the leading • facts is given in the printed opinion of the court below, with which we have been favoured’; and those facts cannot be more succinctly stated than they are in that summary — we shall therefore avail our- . selves of if upon the present occasion. It is as follows: “In the summer of 1817, the complainant, in connection with John H. Piatt* William M. Worthington, and Gorham A. Worth, formed an association to purchase lands of the United States, at a public sale, which was shortly to taire place at Wooster, in this state — and the complainant was appointed the agent of the company, to attend the . sale for that purpose.
 

 “Another association consisting of Martin Baum, Jesse Hunt, Jacob Burnet, William C. Schenck, William Barr, William Oliver,
 
 *397
 
 ' and Andrew Mack, was formed for the same object — and William. Oliver and William C. Schenck were appointed its agents to attend the sale.
 

 “ Before the sale-took place, it was discovered'that both companies were desirous of purchasing the same tracts of land, and; the agents agreed that they would purchase tracts 1, 2, 3, and 4, at, and including, the mouth of Swan creek, in the United States reserve, at the foot of the' rapids'of the Miami; and also Nbs. 86 and 87 on .the other side of the liver, opposite the mouth of Swan creek, for the joint benefit of both companies; each company to have one-half of the lands purchased, and to pay at the same rate. Nos. 86 and 87 were bid off by Oliver, and the certificates of purchase issued to him. .The other tracts were bid off by the complainant, and the certificates: of purchase were issued in the names of the association represented by him.
 

 “At the same sale, the complainánt, in behalf of bis company, purchased the north-west quarter of section 2, township 3, the south-west quarter of 'the same section, the north-west quarter of section 3, township 3, and also the south-east and south-west quarters of the same section, in said reserve; and oné-fourth of the purchase money oh each tract being paid, certificates of purchase were made out in the' names of the-company. And the other agents purchased for their company, at the same sale, other tracts of land.
 

 • “On the return of the agents to Cincinnati, their acts were ratified by both companies. One company was designated the Piatt Company , the other the Baum Company; and the union of both, in regard to the lands jointly .purchased, was called the Port Lawrence Company. The joint, or Port Lawrence Company, having made their purchase with the view of laying out'a town, to-be'called Port Lawrence, appointed Baum a. trustée, and authorized him to sell lots, and do other things in relation to his agency, for the benefit of the company.
 

 ■ “ On the'14th August, 1817, Baum appointed Oliver his attorney, to sell lots in the town to be laid out, receive the money, and give certificates of sale, in the nature of title-bonds, to the purchasers;- and' he, in association with William C. Schenk, was authorized to lay out the town. Baum, and also the proprietors, gave to Oliver á letter of instructions in relation to the plan of the town, -&e sale of the lots, &c. ' By the conditions of sale, one-fourth of the purchase money was to be paid down, and the residue in three equal annual payments.
 

 “At the sale of lots, the sum of $855 33 was received by Schenck, for which he was tcPbe accountable to Baum.'
 

 “At the sale, Oliver purchased lots 223 and 224, an-undivided half of which he afterwards conveyed to Baum, and'they-erected.a warehouse and other improvements on them.
 

 
 *398
 
 “In August, 1818, he sold one-half of his interest in the'Port Lawrence Company to William Steele and William Lytle; and in March, 1819, he sold Jhe residue of his interest to Micajah T. Williams, one of the defendants, and his partner Embre.
 

 “By the reduction of the price of the public lands, and the pressure of the times, the Port Lawrence Company were under the necessity of relinquishing to. the United States tracts 1 and 2, having agreed to pay for the same about $20,000; and of appropriating the money paid on them to the payment in full of the residue of the tracts purchased' by them, and by the Baum and Piatt Companies respectively.- In pursuance of this object, the five quarter-sections purchased by the Piatt Company were assigned to Baum, the 17th September, 1821; and on the same day, tracts numbered 1, 2, 86, and 87, purchased in the name of the Piatt Company for the Port Lawrence Company; and also tracts 3 and 4’, purchased by Oliver for the same company, were assigned to Baum. It is alleged that these tracts had been previously assigned to Baum, of which there is no evidence. - '
 

 “ On the 27th September, 1821, Baum, through his agent, Mica-jah T. Williams, one of the defendants, relinquished, to the -United States, tracts 1 and 2. On these tracts there had been paid the sum of $4817 55. $1372 34. of this sum were applied to complete the payments on tracts 3, 4, 86, and 87, the residue of the tracts purchased at the sale by the Port Lawrence Company. From the relinquished tracts, there still remained $3445 21. Of this sum, one-half-belonged to the Piatt Company. $1248 were applied to complete the payment on the five quarter-sections, which left a balance of $474 60 still due to the Piatt Company; but which was ■applied in payment of lands held by the Baum Company. »
 

 “After the relinquishment of the tracts on which the town had been laid out, the purchasers of town lots claimed a return of the money paid by them, with interest, and also damages for their improvements.
 

 “ On the 10th September, 1822, Baum gave to Oliver a certificate, which stated there was due him, by the Port Lawrence Company, the sum of $213 02, which he refunded to purchasers of lots, by the request of the company, cit being the amount due cn the shares originally, owned by John H. Piatt, Robert Piatt, G. A. Worth, and William M. Worthington.’
 

 “And' on the 27th August, 1823, Oliver having made out an account against the Port Lawrence Company, for money paid by him to purchasers of lots, and services rendered as agent, Baum admitted his account, amounting to the sum of $1835 47; to secure the payment of which, Baum executed to him a mortgage on tracts 3, 4, 86, and 87. The payment was to-be made, with interest, on' or before the. 1st of January, 1824.
 

 “The 7th October, 1825 Oliver caused an attachment to be
 
 *399
 
 issued by the clerk of Monroe 'county, in the-Michigan Territory, against Baum and the members of the Piatt-Company, on the certificate of indebtment given by Baiun. This attachment was-.levied on four of .the five quarter-sections owned by the Piatt Company, and such proceedings were had on the attachment, as to obtain an order of sale of the property attached; three of the quarters were sold, by the auditors appointed, for the sum of $241 60, to Noble, the agent of Oliver. Noble, shortly afterwards,- conveyed these tracts to his principal.
 

 “A
 
 bill "to foreclose the mortgage given to Oliver was filed by him in the Supreme Court of Michigan; the 13th of October, 1825. And a final decree having been obtained, the mortgaged premises were sold, by-the assistant register,of the, chancery court, to Oliver, the 1st September, 1828, for $618 56.
 

 “ By the.“act of 20th May, 1826, the secretary of the Treasury was .authorized' to select, for the benefit of the University of the Michigan Territory, a certain number of- acres of the public' lands within the territory, and he selected' tracts 1 and 2, which had been relinquished.
 

 .-‘In thé summer of 1828, as appears from the report of the committee of the trustees of the university, Oliver, as the agent of Baum and others, proposed to' exchange certain lands owned by Baum, in the vicinity of Port Lawrence, or, any of the public lands subject to entry, for tracts 1 and 2, -on whicK the town of Port Lawrence had ¡ been laid out.
 

 “A law of Congress was passed, authorizing the exchange, the 13th January, 1830. Previous to this, Baum assigned to Oliver -the final certificates for the tracts -he .purchased under the attachment, and-also under the-decree of foreclosure; and one of the quárter-sections levied oh by the attachment, but not sold under it, in payment of the balance of the judgment on thé. attachment, which enabled Oliver to obtain patents for the same in his own name. And on his conveying to the university tracts numbered 3 and 4, except-.ten acres reserved of number 3, and the north-west. quarter of section 2, township 3, and also the north-west and south-west quarters of section 3, township 3, hé received an assignment from the' university of their right to- tracts 1 and 2, for which patents were issued in the 'name of Oliver. -
 

 “ After,the exchange was effected, Baum, and the defendant Williams, each'purchased, an interest of onerthird in tracts 1 and 2, 86 and 87. After;Baum’s-- death,- in 1832, Oliver purchased his interest from his heirs. And the 1st December, 1832, Oliver conveyed to Williams an undivided half of the ten acres reserved in number 3.-,On thé 23d May, 1834, he conveyed' to him an undivided half of tracts 86 and 87, except .sixty acres which had- been-sold to PrentiSs and Tromley; and on the —-day of November, he conveyed to-him * one undivided half of lots 1 and 2, on which Port Lawrence
 
 *400
 
 was laid out, ’togetherc with a like interest in all sales and improvements thereunto belonging.’
 

 u
 
 Oliver, Baum,' and Williams, agreed to lay out the town of Toledo on the site of Port Lawrence, and to make titles to .the Port Lawrence purchasers of lots, on their complying with their contracts. .
 

 “ Some years after this, Oliver purchased from the Michigar University the tracts of land hé conveyed to it in exchange fo] tracts 1 and. 2.
 

 “ Of the Piatt Company, John H. Piatt is deceased, and hjs administrators and heirs are made parties to this suit. William M. Worthington assigned one-half his interest in the Port Lawrence Company, and it is claimed and represented by John É. Worthing-' ton. The interest of Worth has been assigned to the defendant Ewing, who also claims the entire interest of Baum, Mack, Barr, Burnet, and half the interest of the complainant.
 

 “ Of the Baum Company, Martin Baum, * J.esse Hunt, William C. Schenck, and William Barr, are deceased.”
 

 Such is a general outline of the leading facts.. There are others which maybe required to be. adverted to in the progress of this opinion; but- thére are many details which must necessarily be passed over in silence, as they would tend to embarrass the discussion of the main questions in the cause, and obscure rather-than illustrate .the merits thereof.
 

 The object of .the bill is to subject the tracts No. 1 and No. 2, now constituting the site of the. town of Toledo, formerly known as Port Lawrence, to the rights of the Port Lawren.ce Company, composed, as we have, seen, of the Piatt Company and the Baum Company, and those who. claim tinder them, now in- the possession- of Oliver and Williams, under a title derived from the grant of .the Michigan University, upon the ground that a trust jias attached to those • tracts in favour of thé Piatt and Port Lawrence Companies, under the circumstances which will be presently stated. These circumstances are, that the lands given in exchange to the Michigan University, for tracts No. Land No. 2, under the negotiation with the university, were, at the time, the'.property of the Piatt and Port Lawrence Companies, as
 
 cestuis que trust.thereof;
 
 that the facts were at the time well known to Baum, and Oliver, and Williams, and consequently that the trust by operation of law attached thereto in the hands of those parties. To this, conclusion several objections have been taken by the- counsél for the appellants.- In the firs’, place, that-no sit eh trust attached to the lands so^ given, in exchange ■to the Michigan University, at the time of the transfer, and coftse quently/.none to tractsNos. 1 and 2, taken in the exchange. In the-second place, that’ if it did, as Oliver afterwards repurchased the! exchanged lands from the. university, and Oliver and Williams under him now hold some parts thereof, the trtist is revived, and has re
 
 *401
 
 attached to these lands., and thus "has displaced any supposed-trust •upon tracts No. 1 and No. 2, at least
 
 pro tanto.
 
 In the next place, that Oliver and Williams are purchasers without notice of the trust, of .of the trust the '
 

 Before proceeding to the considerations applicable to the first and third points, it-may be well to dispose of that which grows out of the- second point, as it involves a most important principle in equity jurisprudence. It is a clearly established principle in that jurispru..dence, that whenever the trustee has been guilty of a breach of the trust, and has transferred the,property, by sale or otherwise, to any third person, the
 
 cestui que trust has a full
 
 right to follow such property into the hands of such third person, unless he .stands in the ■ predicament of a
 
 bona fide
 
 purchaser, for a valuable consideration, -without notice. And if the trustee has invested Mid trust property-, or its proceeds, in any pther propérty into which it can be distinctly traced, the
 
 cestui que trust
 
 has his election eithér to follow the'same' into the new investment, or to hold the trustee personally .liable for the .breach of the trust. This right or (Option of the
 
 cestui que trust
 
 is one which positively and exclusively belongs to him, and it is not in the power .of the trustee to deprive him of it by any subsequent repurchase of the trust property, although in the latter case the
 
 cestui que trust
 
 may, if he pleases, avail himself of his own right, and take back and hold the trust property upon the original trust; but he.'is not compellable so.ta.do, - The reason is, that this would, enable the trustee to avail himself of his own wrong; and if he had made a profitable’investment of'the trust fund, to appropriate the profit to his own benefit, and by a repurchase of the trust fund to charge the loss or deterioration in value, if any such there had.been, in the mean time, to' the account of the
 
 cestui que trust
 
 — whereás the rule in equity is, that all .the gain made by the trustee,'by a wrongful , appropriation of the trust fund, shall go to the
 
 cestui que trust,
 
 and all the'losses shall- be borne-by the trustee himself. The option, in such case, to take the new or the original fund is, therefore, (as-has. ■been already suggested-,) exclusively given to the
 
 cestui que trust,
 
 and is given to hirirfor.the wisest purposes and upon the soundest public policy. It is to aid in the maintenance of right and in the suppression of meditated wrong. Many cases on this subject will be found collected in the elementary writers. (See 2 Súgden on Vendors, chap, 14, sect. 3, p. 148, &c., 9th edit.; 2 Story Eq. Jurisp. sect. 125.8 to Sect. 1265,3d edit.; Com. Dig.
 
 Chancery,
 
 4 W. 25, to 4 W. 28;) and the rule will be found fully discussed and recognised in Ryall
 
 v.
 
 Ryall, 1 Atk. 59; Lane
 
 v.
 
 Dighton, Ambler, 409; Lench
 
 v.
 
 Lench, 10 Ves. 511; and Docker v. Somes, 2 Mylne & Keen, 655; in many of its important bearings. Lord Ellenborough, in the case of Taylor
 
 v.
 
 Plumer, 3 Maule & Selw. 562, examined and confirmed the doctrine in its application to cases at law, and cited and approved the decisions in equity; so that it is plain upon authority, and the
 
 *402
 
 same would be' equally true upon principle, that if the tracts Nos and. 2 were purchased-with the trust- fund belonging to the Piatt a •Port Lawrence Companies, .the latter are at full liberty to follow the same into the hands of any persons not being
 
 bona fide
 
 purchasers for a valuable consideration without notice, and the circumstance that there-has since been a repurchase of the original trust property by Oliver,- does not in any manner affect, .or control, or vary, the right oroption x>f the
 
 cestuisique 'trust.
 
 The case is not like that put.at the bar, where a part of the funds of-the
 
 cestuis que trust
 
 have been mixed up with other funds exclusively belonging to the trustee' •in the new pinchase or investment. In such a case there may be ground to hold the- trust funds in charge
 
 pro tanto
 
 therein. Here, the,whole consideration of the purchase was a fund wholly and exclusively belonging to the
 
 cestuis que
 
 trust, if they have made out any title at all,
 
 -
 
 which we shall hereafter consider.
 

 Let us then proceed to the consideration. of the other' questions above stated. And the fir§t is, whether at the time of the exchange •Wijh the Michigan University/the lands given in exchange for tracts Nos. 1 and 2, were", in the hands of the party, of parties making that exchange, affected with any trust such as has bepn already suggested ? And this leáds us to the consideration of the antecedent state of facts between the parties to this record.
 

 We have seen that the "original purchase of tracts Nos. 1, 2, 3, arid 4, and Nos. 86 and, 87, was made for the account and benefit of-the Port Lawrence Company; and the object of -the purchase was to lay out a town thereon, and to sell the lots to purchasers. Baum was-appointed a trustee, and agent for this purpose, and he was to- make sale of the lots and. conduct the other' affairs of the agency. With the consent' 'of the company, in August, 1817,-he employed Oliver as a sub-agent, who received instructions from the company in relation to-the plari of the town (which he was .to lay put in conjunction -with Wm. C. Schenck) and the sale of the lots. This agency of Oliver, under Baum, was originally (as it should seem)-limited to-one year, but-it was certainly continued, if not for all, at least for some purposes, tó a much later period. In August, 1818; Oliver sold one-half of.his interest in the Port Lawrence Company to Steele aim, Lytle, aqd in March, 1819, he sold the residue-to the defendant Williams, and his partne'rtEmbrei And these facts are most important to be borne, in mind, since they
 
 clearly
 
 establish that Oliver, as {un original proprietor,- and Williams, as a derivative proprietor, under Oliver* in the Port Lawrence Company, had full and complete notice of the-náture apd objects of .the original , purchase by. that company, and of the trust and - agency of Baum in accomplishing those objects. In truth,- the' laying óut oí a town on those tracts/and. the salepf the lots, seems to have been an enterprise always cherished by some of the company with .uncommon solicitude and sanguine expectations of profit. "
 

 
 *403
 
 ■In consequence of the reduction oYtiie price of the public lands by Congress, and the pressure of the times, the Port Lawrence Company found themselves compelled, in 1821, to-relinquish a part of their tracts to- the government. For this purpose they assigned all 'the four tracts to Bauin, in September, 1821; and the Piatt Company at the same time assigned to-Baum their five quarter-sections; and he, through the defendant, Williams, thereupon relinquished tracts Nos. 1 and 2, to the United States, and the return purchase money was applied
 
 pro tanto
 
 to complete the payments due on the other tracts, (Nos. 8 and. 4, and. Nos. 86 and 87,) and $ie residue ' was applied partly to pay. Die balance due on the five quarter-sections, purchased by the Piatt Company, and partly tó pay a balance due on other lands purchased by the Baum Company.
 

 Pausing here, for a moment, it js apparent that the original trust created in .tracts Nos. ,1 and 2, under the agency and assignment to Baum, for the benefit of the Port. Lawrence Company, was, by this relinquishment to the government, entirely displaced and extinguished. . These tracts afterwards, in the. summer of 1828, under the act of 20th of May, 1826,' were selectéd by the- secretary of the Treasury for the Michigan University, and certainly came into, the possession of the latter discharged of the trust. * Still, however, it is obvious from the. papers in the cause, that in the intermediate time between the relinquishment of these tracts and the grant thereof to the university, the original plan of establishing a town on the sitej. remained a favourite project of Baum as'agent of the Port Lawrence Company, and he made strenuous efforts by applications to Congress, and to the General Land-office, to reacquire the title thereof, not for himself alone, but, as his applications and letters show, on behalf of himself and his associates. He constantly held himself out -as, acting for the benefit of the concern; and there is every reason to suppose, that some, if not all, of his associates were lulled into security, and contemplated, if he should be successful, to resume, the original plan. This may servé'in some measure to-explain their inactivity, and to show that they continued to place unlimited-confidence in Baum, that all his proceedings would be for their benefit, and not for his own sole advantage. Baum petitioned Congress on .the subject ás early as January, 1822, and-in.his letter to Mr. Brown, (a senator in Congress,) of the 25th of December, 1822, enclosing a duplicate of his petition,- he says: “ Enclosed is the petition signed by myself only, still others have an interest in itand he •names in the letter, and its postscript, Williams, ífiatt, and others. In another letter to the same senator, dated the 6th of February, 1823, he says: “ The tracts purchased by myself and .associates in that quarter; those retained and relinquished can be ascertained in the Land-office.” In' another letter addressed to the commissioner of the General Land-office, as late' as the 27th of- July, 1827, he says: “In consequence of the President’s proclamation, announcing'
 
 *404
 
 the sales of lands, I attended, at Delaware, on the 9th instant, but was much disappointed to find there instructions of the General Land-office, to withhold from sale' all lands situate north , of the line which divided, the state of Ohio and the Michigan Territory, for I went there for the express purpose of repurchasing tracts Nos. 1 and 2, in the Maumee reservation, which I- formerly owned and which I have relinquished.” He adds:, “These lands, though bought in sundry persons’ names, were afterwards transferred to me as agent for the purpose of managing and conveying them in case of -sales.” In the same letter he protests against the trustees of the Michigan University, having a grant of these tracts, as.they have no claim-to the same, and that he has a strong claim upon the government.
 

 To repel the inferences deducible from these facts, it is said, that the testimony of Carneal establishes that Piatt attended that very sale at Delaware fOrthe purpose of buying these tracts, not for the Port Lawrence Company, but for another company consisting of Colston, Carneal, and himself; and that Baum'also attended on his own account, and not for the Port. Lawrence Company. . Of transactions of this nature, after such a lapse of .time, it is perhaps not easy to ascertain all the facts which then regulated the conduct of the parties, when they-depend upon-the frail recollections of witnesses.' It is quite possible that the circumstances might have been explained, and nothing have been intended by either party really injurious to the interests of the PorttLawrence Company. But as no sale took place of these tracts upon that occasion, the only effect which can be properly attributed to the testimony, admitting it in its fullest latitude, is, that it weakens -our confidence in Piatt’s own conduct, and diminishes the force of the inference as to Baum’s then acting as an agent for the Port Lawrence Company. But the written statements of Baum in the letters above cited are evidence of his.intentions and acts, of a far higher character, which the lapse of time has not obscured.or varied, and those letters are, as to himself, most conclusive-tp show, that he did not deem himself as acting for his own interest alone, but for that of his associates also, in his whole proceedings to re-acquire those tracts.
 

 As' soon as the Michigan -University had obtained a title to tracts Nos. 1 and 2, (in the summer of 1828;) Oliver, avowedly on behalf. of Baum, made an application to the trustees of that university for an exchange of those tracts for other tracts in the vicinity. These negotiations were begun as early as the 12th of August, 1828, and various propositions were made and negotiations were had by the trustees and'Oliver, as agent of Baum, between that time and the' 4th of 'January, .1831, when the consent of Congress having been obtained for the exchange, by an act approved on the i3th of January,-1830, the university agreed to .make the exchange; and accordingly, by their deed, dated the 7th day of February, 1830, did
 
 *405
 
 convey their right, and title to tracts Nos. 1 and .2 to Oliver hr fee-simple, in consideration of receiving a deed from Oliver of certain tracts, containing seven hundred and sixty-seven and a'half acres, viz.: the whole of tracts Nos. 3 and 4, the ’ south-west quarter of section 2, and the west half of section 3; the tracts being part of the purchase of the Port Lawrence Company, and the quarter and-half sections being part of the' purchase of the Piatt Company, in 1817.. We thus trace the trust property home to the Michigan'University, as obtained by a conveyance from and under Baum and Oliver in pursuance of a negotiation, avowedly made by Oliver on behalf and as agent of Baum) as the sole consideration of the grant of Nos. 1 and 2 to Oliver by the university.
 

 And this conducts us to .the consideration of that which is the •main hinge on which .the present case > lifts"; that is, whether-the tracts, so conveyed by Oliver'to the university, were at the time .affected with the trust in favour of the' Piatt and Pott Lawrence Companies, with which they were originally chargeable in the hands of Baum. .This necessarily involves a review'of the title of Oliver to thfe tracts (the three quarter-sections) bélonging to' the Piatt Company under the attachment proceedings in Michigan, and also of his title under the mortgage of tracts Nos. 3 and 4, and Nos. 86 and 87, belonging to the Port Lawrence Company, and the foreclosure thereof, — iti connection with the subsequent acts of Baum and Oliver in the premises. Unless the title thus derived is beyond all legal exception
 
 (omni exceptions major),as
 
 an adverse and unimpeachable title, it is plain, that the original trust attached at the time of the exchange, to the tracts so conveyed, and consequently (as has been already suggested) it was,, at the option of the
 
 cestuis que trust,
 
 transferable ana transferred to tracts Nos. l and 2. For it is in our-judgment beyond all question, that'.Oliver at the timé of the ex-, change' had full notice of the trust and title originally invested in Baum, and that his acts in making the exchange are to be deemed the acts, of Baum, and affected by the same considerations as if personally transacted by Báum himself, and were designed by mutual consent to promote the contemplated objects and interests of both.
 

 And, first, let. us review the proceedings under the attachment. In September, 1822, Baum gave a certificate to Oliver, stating that a debt of $213 0.2 was due to him from, the Port Lawrence Company for money refunded to purchasers of lots at the request of' the company.
 
 “
 
 it being the amount due on the shares originally .owned by John H. Piatt, Robert Piatt, G. A. Worth, and Wm. M. Worth-ington.” These pérsons constituted the Piatt Company'; and consequently the claim thus asserted was a sub-division of a debt confessedly due from the Port Lawrence Company, in which the Piatt Company had a moiety of the interest,only. Whether Baum had, in virtue of his general agency, the right to give such a certificate, thus severing a joint debt* so as to be binding upon the Piatt Com
 
 *406
 
 pany alone, without their. consent, and whether this certificate was
 
 bona fide
 
 given iin'der justifiable circumstances, it is unnecessary to consider, although the transaction is certainly open to some observation in.point of. authority as well as propriety in the then unliqui-dáted concerns of the Port Lawrence. Company. Assuming,- however, thé transaction to have.béen perfectly-correct and binding in all respects, let us examine the subsequent proceedings consequent thereon. Upon this certificate Oliver, in October, 1823, instituted a suit by attachment in Monroe county, in the territory of Michigan, against Baum, Robert Piatt, G. A.' Worth, and William Worthing-ton, (John H. Piatt being then deceased,) alleging them to be joint partnérs and survivors, and all residing out of the territory — upon which four of the quarter-sections of laiid owned by the Piatt Company in that county were attached.' At the October term, 1826, of the sam'e court, judgment-was obtained by default' against all the defendants, no appearance having been entered for them ; and upon the - execution issuing thereon, three of the four sections (those which were afterwards conveyed to the Michigan University) were sold, and bid off by an agent of Oliver, and were afterwards conveyed by him to Oliver. Of this suit there is no pretence to say, that any of the defendants, except Baum, had any notice, if indeed he had any, although some of them resided in the same state where Oliver resided, and one of them in a neighbouring state, -at no great distance, who was ■ known to be a man. of large property. The other members of the ■Port Lawrence Company were not made parties to the suit-. It was brought in a distant territory, almost then a wilderness, more than two hundred miles from the residence of the defendants; and if it had been the design of Oliver to procure a judgment against the parties, without any'notice to them,- which should be obligatory upon them, and to give .Oliver a good title to the lands at. a comparatively trivial price, better means could scarcely have been»devised to accomplish the purpose. For the institution, and consummation of this suit behind the backs and without the knowledge of the parties in interest, no, better excuse can n'ow be found .than that Oliver did not choose, to institute a suit against them at home, as it might give them offence and .break up some former ties of acquaintance. How far such an excuse is admissible we do not stop to inquire. It rather tends to cast a shade upon-the transaction than to vindicate it; Biit what Was the title thus acquired, supposing all the proceedings do be
 
 bqna fidet
 
 It was .a mere naked title in equity .to the tracts, the title to which still remained in the United States; and the legal title could not be consummated, unless the certificates of the purchase and, payments for the tracts, were first surrendered to the United States'. Those certificates were then iñ the hands of Baum, as trustee of the Piatt Company ; and he had no right under the circumstances- to assign or surrender those certiñcatés to Oliver to enable him to make ms title available at law, without the. express consent
 
 *407
 
 of the Piatt Company. If he nad refused, Oliver could not have obtained them, unless upon a bill in equity to which all the proprietors should be made parties, and in which they would have been at full liberty to examine into the validity and merits of the original claim of Oliver,-on which his. attachment was founded, and also into the regularity and
 
 bona fides
 
 of the transactions in',and under'the suit.- Yet Baum, in December, 1828, assigned and surrendered up these certificates to Oliver, and thus enabled him to consummate his title and reduce it to a legal'title, by obtaining a patent, without any such consent; and in so doing he was guilty of a manifest breach of trust, of which Oliver cannot now be permitted to pretend ignorance. It is also a fact of no small significance, that the surrender of these certificates was contemporaneous with the surrender to Oliver of the certificates of tracts Nos. 3 and 4; and subsequently, in December, 1829, a like surrender of Nos. 86 and 87, belonging to the Port Lawrence Company^ under'the foreclosure of the mortgage, which we shall have occasion to review; and that all this was done pending the negotiations with the Michigan University by Oliver on behalf of-Baum for the exchange.
 

 This view of the matter .releases us from no small doubt and difficulty in relation to an argument pressed at the bar with great earnestness ; and that is, whether such an equity was attachable and vendible under the attachment- law of Michigan. There is great difficulty in maintaining the affirmative,- for the reasons stated in the ■ opinion of the learned judge in the court -below; and especially if,' as has been suggested, the act is but a transcript of an act of New- . Jersey, and the courts of that state have, as has been asserted at the . -bar, held no such equity attachable.
 

 Then, as to the mortgage and the proceedings under it. The mortgage was given upon tracts Nos. 3 and 4, and Nos. 86 and 87, by Baum to Oliver, in August, 1823, upon an account then adjusted between him and Oliver. against the Port Lawrence Company (and' which does not appear ever to have been examined or sanctioned . by the company itself) for a balance of $1835 47, then supposed to ' be due to him for money paid and services rendered by him as agent of the company. In October, 1825, a bill was filed in the Supreme Court of Michigan (within which these tracts were situate) to foreclose the mortgage; and such proceedings were had upon this suit, that, in September^ 1828, the tracts were sold, and at the sale bought .by Oliver for the sum of $618 56, and a deed of conveyance thereof was accordingly made to him. To this suit Baum alone was made a party; none of- the other propriétors of the Port Lawrence Company being made parties, although Oliver knew perfectly well who they were, and that Baum was merely their trustee, and ■ that' they were the
 
 cestuis que
 
 trust, possessing the beneficial interest in the premises. Under, such circumstances, to allow the foreclosure to stand, so as to conclude the rights .of the
 
 cestuis que
 
 trust, would be a violation of
 
 *408
 
 ¿11 the doctrines of 'courts, of equity upon this subject. The decree must be treated, as to them, as wholly inoperative and void.
 

 But there is another view of the matter, which is conclusive. The mortgage was of a mere equity, the legal title being still outstanding in. the United States; and supposing that this equity could have been foreclosed in such a suit, (which, considering the defect of the real parties in interest, it clearly could not,) still it was a naked equity, which could be made available to obtain a legal title from the United States, only by an assignment and surrender of the certificates of the purchase and ’payments, then held by Baum for the benefit and use of the Port Lawrence Company. And. here, again, the same considerations apply, which have been already suggested. Oliver could not obtain an assignment and surrender of those certificates, except by a bill in equity against Baum, to which the other proprietors in the Port Lawrence Company must have been made parties, as they were necessary parties; and thus the whole merit of the mortgage and 'foreclosure must have been brought directly before the court for adjudication. Yet Baum, without any consultation with.or assent of those proprietors, assigned and surrendered the certificates of those tracts also to Oliver, and thus enabled him to obtain a patent therefor from the United States, in subversion of their rights and his duty. This ■ was a gross breach of trust, and was done (let it be repeated) in December, 1828 and 1829, pending the negotiations with the Michigan University, obviously for the purpose of enabling Oliver in his, Baum’s,'name, and on his behalf, to consummate the exchange. And, fin.ally, when the negotiation was consummated by means'of these very certificates, Oliver, with the consent of Baum, was enabled to obtain a patent therefor, on tire 4th of March, 1831.
 

 Very soon after the patent was'so' obtained, viz., on the 16th of May, 1831, we find that Baum, Oliver, and.Williams, entered into a written agreement, by which Oliver purported to sell,'in fee-simple, to Baum and Williams, each one-third part of the tracts Nos. 1 and 2, and Nos. 86 and 87., with the exception of sixty acres out of No. 86; and they were to receive a quit-claim deed therefor from him accordingly, for the sum of $1555 for each third part. • The parties farther agreed to lay out a town upon the eld site, with some change of the plan, and to bring the lots into the market for sale; and they were to contribute to the charges and expenses according to their respective interests. After the death of Baum, Oliver purchased his share of the tracts from his heirs; and by certain deeds of quit-claim, executed in December, 1832, in May, 1834, and in November, ' 1834, Oliver conveyed one-half of the premises to Williams.
 

 Now, looking at these transactions together, it seems almost im- ■ possible to escape from the conclusion, that Baum and Oliver had a mutual interest in the negotiation with the Michigan University; that it was not only carried on in the name of Baum, and apparently for his account but that Oliver acted as his agent throughout; that the .
 
 *409
 
 deed from the University was made directly to Oliver, with the consent of Baum; that the assignment and surrender of all the certificates by-Baum, to Oliver, was for the express purpose of enabling Oliver to complete the bargain with the university ; and that the agreement between Baum, Oliver, and Williams, which followed almost immediately upon the grant of the patent,, was 'made in pursuance of a prior understanding between all the parties, and was but a cohsummation-of the objects originally contemplated by Baum and Oliver, from the period of their first negotiation with the University down to the time of the execution of that agreement. And all this was done by Baum and Oliver, without the knowledge, or gonsent,. or approbation, of the Piatt and Port Lawrence Companiés, and was never sanctioned by them. Under such circumstances, what'is the true duty of a court of equity? It is, to'hold the patties engaged in these transactions, with full notice of the title and the trust in Baum, bound by that trust, and to enforce that trust against tbe tracts Nos. 1 and 2, so far as they remain in their hands unaffected by the rights of purchasers under them,
 
 bona fide
 
 for a valuable consideration,' without notice. In our judgment, no reasoning can make the proposition more clear than a ample recital of the facts, and the statement of the general doctrine of equity jurisprudence that the
 
 cestuis que trust
 
 have an option to follow their property, or its proceeds, into any other property into which it has been converted by a breach of the trust, subject only to the rights of such purchasers as have been just referred to. Indeed, the question, as against Baum and Oliver, seems absolutely closed by the state of the evidence; and their intimate knowledge of the whole concern requires neither illustration nor commentary.
 

 Let us, then, proceed to the consideration of the case as to Williams. Itis said that he stands in the predicament of a
 
 bona fide
 
 purchaser for a valuable consideration, without notice; and if he does, he is certainly entitled to protection. Williams, in his answer, asserts himself to be such a purchaser, but it is difficult to maintain that averment in its just legal sense, looking to all the circumstances of the-case. In 1819, he became a purchaser of one-half of the interest of Oliver in the Port Lawrence Company, and, as such, he could not fail to know that tracts Nos. 1 and 2, 3 and 4, and Nos. 86 and 87, belonged to that company; and he has never ceased to be a member of that company. In 1821, he was employed by Baum, the acknowledged trustee and agent of the company, to surrender tracts Nos.-1 and 2 to the government of the United States; and through him the relinquishment took place. He says that he did not know of the negotiation between Oliver and the University, for an exchange'of the lands, until after its consummation, and never heard of the details of said negotiations, nor what lands •were given in exchange, except parts oftráets Nos. 3 and 4. Now, these very tracts belonged to the Port Lawrence Company, so that he was ne
 
 *410
 
 -cessarily put upon the inquiry by what means Baum had parted.with them,-and Oliver had become possessed of them. • Besides, in-his negotiation and surrender of tracts Nos. 1 and 2 to the government, and the apportionment of the- funds arising' from the relinquished' lands, first to the remaining lands of the Port-Lawrence Company, and then to the lands respectively purchased by the Piatt and Baum. Companies, he necessarily became acquainted with the relative interests of all these companies therein. The origin and title of the Michigan University to the tracts Nos. I and 2, and the exchange . thereof with Oliver, were matters of public notoriety, and proclaimed in the acts of Congress under which the exchange was made. The deed from the University to Oliver recited the material facts respecting the lands" given in exchange, and referred to the records of the antecedent negotiations; and the patent itself, from the government, of tracts Nos. 1 and 2, referred to the deed of Oliver to .the University, of the lands given in exchange ; so that it is most manifest that Williams, .as a proprietor in the Port Lawrence Company, and as agent- thereof in the relinquishment above referred .to, and as a purchaser under Oliver,'not only had the most ample means of knowing the nature arid character and' extent of the title of Oliver to the • lands under consideration, but he was positively put- upon inquiry in relation to the whole matter. If, upder such circumstances, he chose to remain in indolent ignorance or indifference to the .title; it was a voluntary ignorance • and indifference, which ought.not to be. permitted, to avail him against the rights of. the
 
 cestuis que trust
 
 If we add to this the fact that within .two months after the patent was obtained by Oliver, he and Baum united in an agreement with Oliver, by which each was to take a-third part in- the tracts Nos. 1 and 2, .and Nos. 86 and 87, (these tracts .never having been relinquished by the Port Lawrence Company to die government,) to'be laid out as a town, and the lots sold on joint account, it would seem almost incredible that he should not have made some inquiries on the subject. And the only reasonable conclusion seéms to be, that he. was in as full possession of all the facts as were his partners Oliver and Baum. Apother significant circumstance is,- that this very agreement contained a stipulation that Oliver should' give a quit-claim deed: only for the tracts; and the subsequent deeds given by Oliver to him accordingly were drawn up without any covenants of warranty, except against persons claiming under Oliver, or his heirs and assigns. _ In legal effect, therefore, they did convey no more than Oliver’s right, tide, and interest, in the property; and under, such circumstances, ' it is difficult to conceive how he can claim protection as a
 
 bbnafide
 
 purchaser, for a valuable consideration, without notice, against any title paramount to that of Oliver, which attached itself as an uneXtinguished trust to the tracts.-
 

 And here; in our judgment, the merits of the case would seem to be brought to a close. But certain objections have been .made to
 
 *411
 
 the .right of the plaintiff to maintain the bill upon other collateral grounds. In the court below , an objection was taken, by way of plea, that the original agreement of the Piatt and Baum companies, in.regard to the purchases of these tracts at the public sale in 1817, was an illegal combination in fraud of the rights of the United States, and-therefore it makes the whole purchase'an utter nullity. This .objection was fully answered in the opinion of the Circuit Court, in' which, on this point, we fully concur. It has been abandoned by the learned .counsel here; ^and, indeed, in our opinion, properly . abandoned, as unmaintainable in point of fact as well as law.
 

 Another' objection is to the lapse of time. The mere lapse of time constitutes of itself no bar to the enforcement of a subsisting trust; and time begins to run against a- trust only from the time when it _is .openly disavowed by the trustee, who insists upon an adverse right and interest, which,is fully and unequivocally made known to the
 
 cestui que trust.
 
 Now, until 1831, no final 'overt act was done by Baum in. violation of-his duty as trustee; and the first and great breach of that duty, on his part, was'the surrender of the certificates of the tracts to Oliver at different periods .between 1828 and 1831, At what particular period the subsequent acts of Baum, Oliver, and Williams, became first known to the plaintiff and the other proprietors of the Piatt and Port Lawrence companies having the same interest, does not distinctly appear; but the ’facts'could not have been fully-known,or understood until within a few years before the filing of the.bill, and,at most probably not exceeding éight or ten. .That period, upon admitted principles, is far-too short, to interpose- any positive bar to relief in equity. There may have been, an unjustifiable delay,-and gross inattention-on the, part of some of thé proprietors. But as against persons perfect'-y conu-sant of the trust it can furnish no ground for any denial of the relief which the-case otherwise requires. '
 

 Another objection urged at the argument is, that the bill is multifarious in uniting the trust-property owned-hy the Piatt Company and the Port Lawrence Company in one” bill, as the interests of each are separate and distinct in the tracts conveyed by Oliver to the Michigan University. • We are of opinion that the bill is in no just sense multifarious. It is true that if embraces the claims of both ' the, companies; but' their interests are so mixed up in all these transactions, that entire' justice could scarcely be doné, at least not conveniently done, without a unión of the- proprietors of both- companies; and- if they had not been joined, the bill would have been open to the opposite objection that all the proper parties were hot before the court, so as to enable-it to make a final and conclusive decree touching all their interests, several' as well as joint. It was well observed by Lord Cottenham in Campbell v. Mackay, 1 Mylne & Craig, 603, and the same doctrine .was affirmed in this court in Gaines and wife
 
 v.
 
 Relf and Chew, 2 How. 619, 642, that it is
 
 *412
 
 impracticable to lay down any rule, as to what constitutes multifariousness, as. an abstract proposition; that each case must depend upon, its own circumstances;-and much must'necessarily be left, where the authorities leave it,, to the sound discretion of the court.(a) But, if the objection were tenable, (as-we are of opinion it is not,) it would be quite too late to insist upon it. The objection of multifarioüsness cannot, as a matter of right, be taken by the parties, except by demurrer, or plea or answer; and if not so taken, it is deemed to be waived. It cannot be insisted upon by the parties even at the hearing in the court below, although it may at.any time be taken by the court
 
 sua
 
 sponte, wherever it is deemed by the court to-be necessary or proper to assist it in-the due administration of justice. And at so late a-.periodns the hearing, so reluctant is the court to countenance the objection, that, if it can get on in the cause to a final decree without serious embarrassment, it will do so, disregarding the fault dr error, when it has been acquiesced in by. the parties up to that time.
 
 Á fortiori
 
 an appellate "court would scarcely entertain the objection,, if it was not forced upon it by a moral necessity. There is no pretence to say, that such is the predicament of the present cause in this court.
 

 Another objection taken at the argument is, that Baum’s heirs cannot insist upon any title to the property in question, because they are bound by the warranty of their ancestor in the conveyance thereof to Oliver. But this objection has no foundation whatsoever in law, whether the warranty be lineal or collateral; for the heirs here do not claim any title to the property by descent,-but. simply ■by purchase; and it is only to cases of descent that the doctrine of warranty applies. -For this it is sufficient to cite Liti. sect. 735; Co. Litt. 365; Com. Dig. Guaranty, I. 2, and Bac. Abridgment, Warranty, G, H, I, L. The fact, therefore, that assets descended upon Mary P. Ewing, one of the children and heirs of Baum, can have no influence upon the right of her husband or herself to enter the land in controversy by purchase, however it might repel their right to take it by descent.
 

 Another objection, suggested at the argument was the difficulty of apportioning the respective interests of the
 
 cestuis que trust
 
 in the tracts Nos. 1 and 2. But this difficulty has been overcome; and it constitutes no matter of difference between the Piatt and the Port Lawrence Companies, so far as their own interests are concerned, as distinguished from that of Oliver and Williams.
 

 As to the report' of the master and the exceptions thereto in the court below, although-those exceptions were not formally overruled or allowed; yet it is plain thát'in the final decree they were all disposed of, some being allowed-and others disallowed; and no argu
 
 *413
 
 ment has been addressed to us upon the present occasion, which points out any specific errors, which require correction beyond those which have been already incidentally hinted at.'
 

 We pass over some other objections, which were'suggestéd at the argument, without remark, as this opinion has already been protracted to an unusual length. We need only say, that We see nothing in those objections which requires us to. reform the decree of the court below.
 

 Upon the whole, the decree óf the Circuit Gourt is affirmed, with costs;