# FIRST NAT. BANK OF CINCINNATI *v.* H. M. BATES.

*( U. S. District Court, Southern Dist. of Ohio, Am. Law Register.)*

A WAREHOUSE RECEIPT, though not in the commercial sense of the term negotiable, is an assignable instrument.

The assignment and delivery of such an instrument vests the legal title of the property in the assignee, without notice to the warehouseman.

The statement in such an instrument, that the property is to be delivered upon order, upon the *return* of the receipt, is a representation upon which the assignee has a right to rely, and if after the assignment and delivery of such an instrument, the warehouseman, without the consent of the assignee, delivered the property to the person to whom he had given the receipt, he will be liable to the assignee for the value thereof, although he had no notice of such assignment.

COLLATERALS, which are pledged to secure a special indebtedness, can not be applied to other debts; but collaterals pledged to secure a given debt, are bound for any renewal of the original debt for which it was pledged.

This was an action brought by the assignee of warehouse receipts against the warehouseman, for delivering the property stored to the assignor, after the assignment. The facts were substantially as follows: In December, 1876, and January, 1877, defendant received from James B. Grant, three lots of lard, and issued therefor warehouse receipts, each receipt stating that the lard was "subject to his order upon the return of this warehouse receipt."

Grant afterwards assigned and delivered these receipts to plaintiff, who, however, did not notify defendant of the assignment. Defendant afterwards, without any knowledge of such assignment, delivered the lard to Grant without requiring the production of the receipts. Plaintiff claimed that the receipts had been assigned to it as collateral for all indebtedness, present or future, on account of loans made from time to time to Grant, and that this indebtedness at the time of suit brought, amounted to more than the value of the lard. Defendant claimed that the receipts had been assigned as collateral for special loans which had been afterwards repaid, and further, that as defendant had received no notice of the assignment, he was discharged from all liability by his delivery of the lard to Grant.

SWING, J., charged the jury as follows:

Upon a demurrer to the evidence, we have already determined that this action is in the nature of an action of trover to recover

for a wrongful conversion of the property described in the ware-house receipts. It is therefore unnecessary to determine the nego-tiable properties of warehouse receipts. We may remark, how-ever, that in the commercial sense of the term they are not nego-tiable instruments. But it is the well settled law that they are as-signable.

In this view we are required to ascertain, therefore, what rights of property and possession vested in the assignee by the assign-ment of these warehouse receipts, but in doing this we shall not attempt a review of the numerous authorities cited by learned counsel, or perhaps the more difficult task, of reconciling them, as the Supreme Court of the United States, in *Gibson* v. *Stevens*, 3 How., 399, has declared the law upon the subject, and by this we are governed.

In that case McQueen & McKay had purchased of certain parties, a quantity of pork and flour, which was then in the ware-house of the vendors, and had taken from them a written memo-randum of the sale, with a receipt for the money, and an engage-ment to deliver it in canal boats soon after the opening of canal navigation. There was also a written guarantee that the articles should bear inspection. Afterwards, McQueen & McKay, in consideration of advancements made to them by a commission merchant, indorsed and delivered these papers to the merchant, and the question determined by the court was the legal effect of such indorsement and delivery.

Chief Justice Taney, in delivering the opinion of the court, says: "In the opinion of the court, it transferred to him the legal title and constructive possession of the property; and the ware-houseman, from the time of this transfer, became his bailee, and held the pork and flour for him; the delivery of the evidence of ti-tle and the orders indorsed upon them was equivalent to the de-livery of the property itself."

The principle of that case applies to the assignment and de-livery of warehouse receipts, and was so recognized by Judge Dillon in *Harris* v. *Bradley*, 2 Dill., 285, and by Justice Miller of the Supreme Court, in *McNeil* v. *Hill*, 1 Woolworth, 96.

The legal title and constructive possession of the property be-ing vested in the assignee of the warehouse receipts, he has the right to maintain an action for its conversion.

If, therefore, the jury shall find from the evidence in the case, that the warehouse receipts in controversy were assigned and delivered by Grant to the plaintiff in pledge as collateral security for any general indebtedness which then, or might thereafter exist from Grant to the plaintiff, and said Grant was then indebted, or afterward became indebted upon the faith and credit of these papers to the plaintiff, and such indebtedness remains unpaid, and the defendant, without the knowledge and consent of the plaintiff, surrendered the lard to Grant, the plaintiff will be entitled to your verdict for the value of the property, not exceeding the amount of the indebtedness by Grant to the bank, and to this the jury may add a sum equal to six per cent. interest to the first day of the term.

The defendant, having delivered to Grant these receipts, placed it in his power to treat with the plaintiff upon the faith of them; and his statement in them that the lard was to be delivered upon the order of Grant upon the return of the receipts, was a representation upon which the plaintiff had a right to rely; and if without the return of such receipts, he delivered this lard to Mr. Grant, it will not protect him in this case.

If the jury find from the evidence in the case, that all of the warehouse receipts in controversy, were not pledged as general collaterals for general indebtedness of Grant to the plaintiff, but were pledged as special collaterals to secure specific loans, and the loans for which they were pledged have all been paid, then your verdict will be in favor of the defendant; or if a portion of them were so specifically pledged, the plaintiff would not be entitled to a recovery for those so pledged.

The plaintiff has asked the court to give the jury the following instructions, among others:

1. We ask the court to instruct the jury, that if the defendant received the 300 tierces of lard from James B. Grant into his warehouse, and gave him the three warehouse receipts set out in the petition, and while the said lard was so stored in the said warehouse, the said Grant indorsed the said warehouse receipts, delivered and pledged them to plaintiffs under the paper in evidence called a general collateral, dated December 23, 1876, for money then borrowed or then due, and as a basis of continued debt or of continued or future loans, and the plaintiff in good faith, relying upon such pledge, subsequently loaned, or continued

the loans upon the faith of such warehouse receipts as a security, and which loans are now due and owing the bank, then the lard named in such receipts, from the time of such pledge and indorsement, became the property of the plaintiff to the extent of such indebtedness, and if the defendant afterwards gave said lard to Grant, or to any one else, without the return of the said warehouse receipts, and without the consent or knowledge of the plaintiff, whereby it has been lost to the plaintiff, then the defendant is liable in this action to the plaintiff for the value of said lard at the time of its delivery to said Grant and loss to the plaintiff, and the jury may add to such sum as damages, a sum equal to six per cent thereon.                                        *Given.*

2. If the plaintiff and defendants have both suffered by the fraud of James B. Grant, by the defendants leaving the warehouse receipts in question outstanding, and the delivery to him of the lard without the said warehouse receipts, and by the use of said receipts by said Grant in the ordinary course of business as a means of credit with the plaintiff, then the defendant must bear the loss.                                        *Given.*

3. That to transfer the title to property held by a warehouseman, and for which he has given a regular warehouse receipt, to a party as collateral security for a loan, by indorsement and delivery of the warehouse receipt, it is not necessary that the party receiving the receipt as such collateral shall give notice of the assignment of such receipt to him.                          *Given*

The defendant has also asked special instructions as follows:

1 The warehouse receipts of Bates, copied into the petition, were not negotiable, so that their indorsement and delivery by Grant to the bank vested a right of action thereon in the bank against Bates for the lard or the value thereof.

Refused, as written, given as follows: "It did not vest a right of action as upon a negotiable note or bill of exchange, but it did vest in the bank a right to maintain an action for injury to, or conversion of, or for a recovery of the property."

2. The indorsement and delivery of said warehouse receipts by Grant to the bank created no privity of contract between them which prevented Bates from delivering said lard to Grant, unless said Bates had notice of said transfer to the bank.     *Refused.*

3. The only effect of said indorsement and delivery of the warehouse receipts by Grant to the bank, was to transfer to said

bank the title to said lard and the right to its possession, and to constitute said Bates the bailee of said bank when notified of said transfer to the bank.                    *Refused.*

4.   The stipulation of said warehouse receipts that said lard is subject to the order of Grant on the return of said receipts, is personal between said Bates and Grant, and said Bates could waive their return unless he had notice of their transfer to the bank.                    ·     *Refused.*

5.   If said First National Bank and the warehouse and place of business of said Bates were in Cincinnati, and the same was known to the representative officers of said bank, and they did not, within a reasonable time after said receipts were transferred to the bank, notify said Bates of said transfer, then said bank was guilty of negligence, and said Bates was not bound to keep said lard, but was justified in delivering it to said Grant.   *Refused.*

6.   If the representative officers of said bank knew, while the bank held said receipts, that said Grant was, from time to time, obtaining said lard in parcels from said Bates, and did not object, then said bank cannot complain if said Bates delivered all said lard to said Grant.                    *Refused.* ·

7.   If said bank officers had good reason to believe, from the course of business of said Grant with said Bates, that said Grant was obtaining said lard in parcels from time to time, while it held said receipts, it was their duty to have inquired about it, and to have notified said Bates, and their failure to do so exonerates said Bates from all liability.                    *Refused.*

8.   If the custom of pledging such warehouse receipts as collateral upon which to raise money was not shown among warehousemen, and said Bates had not notice of any such custom, then he is not bound by it, and it did not prevent said Bates delivering said lard to said Grant, and the transfer of such receipts to the bank was not binding on said Bates.                    *Refused.*

11.   If the bank claims the collaterals under the four notes dated in August and September, 1877, about eight months after the receipts were issued, it was the duty of the bank to have first inquired to ascertain if Bates was in Cincinnati accessible to them. The lapse of time was such as to put the bank on inquiry about the lard before they could hold Bates responsible.

Refused, as written, given as follows: "If these loans were , made at the date of the last notes; if they were original loans of

that date, and Grant had then presented the bank with these collaterals, which had been given some eight months before that date, it was the duty of the bank to make inquiry in regard to them before taking them as security. If, however, they were renewals of original notes, and the receipts had been pledged as collaterals to the original notes, the renewals would carry the pledges with them to the last note of such renewals."

*Verdict for plaintiff, $8955.*

# DIGEST AND NOTES OF RECENT CASES.

AGENT— *General power of attorney.* A general power of attorney to an agent to sell lands, and to do all things necessary to be done as fully as the owner could do, etc., gives to such agent power to make sales upon credit.

*Principal bound by acts of.* Although the principal may not have had actual knowledge that his agent was selling his lands on time, yet the mortgages and trust deeds taken by his agent containing descriptions of the property sold, and the notes taken to secure the purchase money, were placed upon record, and it would not be unreasonable to hold that the principal had notice of what the record made by his own agent disclosed. —*Bullock* v. *Silvermann*, Sup. Ct. Ills., Chicago Legal News, Oct. 16, 1880.

ATTACHMENT—*Issued without sufficient affidavit will not protect officer.* The fact that a writ of attachment is valid on its face, will not protect an officer acting under it, when it was issued without a sufficient affidavit.— *Matthews* v. *Dinsmore*, Sup. Ct. Michigan, Inter. Rev. Record, Oct. 11, 1880.

ATTORNEY—*Court may of its own motion strike from roll.* A court has jurisdiction upon its own motion, without complaint, to strike the name of an attorney from the roll in a proper case, upon notice and opportunity to be heard. Misconduct in his office of attorney, in or out of court, will authorize a court to strike the name from the roll.

*The publication of a libel upon the judges*, in a public newspaper, reflecting upon their official integrity, is not such misconduct in the office of attorney as will subject him to summary disbarment prior to indictment, trial by jury and conviction, or upon confession in open court; unless "the motive should be clearly shown to have been the acquirement of an influence over the judge in the exercise of his judicial functions by the instrumentality of popular prejudice." Members of the bar are entitled to criticise the action of the Judges, subject to the penalties of libel, like any other citizens.—*Exparte, Steinman & Hensel*, Sup. Ct. Pa., Leg. Intelligencer, Oct. 15, 1880.