### GRISWOLD *v.* BRAGG and Wife.

*(Circuit Court, D. Connecticut. February 21, 1881.)*

1. BETTERMENT ACT—CONN. GEN. ST. (REV. 1875) p. 362, CONSTRUED.

Where a defendant in ejectment, in good faith, believing that he had an absolute title to the land in question, has made valuable improvements thereon, before the commencement of the action of ejectment, final judgment will not be rendered for the plaintiff in ejectment until he has paid to the defendant the value of his improvements, less the sum due by him for use and occupation.

Where good faith and belief actually existed, the deeds not showing that an absolute title was not conveyed, and the defendant not being chargeable with laches, he will be allowed the value of his improvements, notwithstanding that he held merely under a quitclaim deed.

Mere notice of adverse claim does not forbid the conclusion that such subsequent improvements were made in good faith.

In Equity.

SHIPMAN, D. J. This is a bill in equity, supplemental to an action of ejectment in favor of the present defendants against the present plaintiff, and founded upon the statute of this state commonly called the "Betterment Act." Gen. St. (Rev. 1875,) p. 362.* The plaintiff in the ejectment suit recovered

* "Final judgment shall not be rendered against any defendant in an action of ejectment, who or whose grantors or ancestors have in good faith, believing that he or they, as the case may be, had an absolute title to the land in question, made improvements thereon before the commencement of the action, until the court shall ascertain the present value

a verdict against the defendant for the seizin and possession
of an undivided fourth part of a tract of land containing
an auger factory and a mill privilege in the town of Chester.
The defendant thereupon filed a bill praying for the relief
provided for by the statute.

On May 5, 1845, Joseph C. Dudley conveyed the land in
question, and other lands, by warranty deed, to Joshua
L'Hommedieu, and on March 28, 1846, the said Dudley, as
guardian, appointed by a court of probate in the state of
Massachusetts, of his minor children, Orestes Dudley and
Cecelia M. Dudley, conveyed to said Joshua and Ezra L'Hom-
medieu the interest of said minors in all said lands by virtue
of an order purporting to have been made by the court of
probate for the district of Saybrook, wherein said lands were
situate. Ezra L'Hommedieu conveyed to said Joshua his
(the said Ezra's) interest in the land now in controversy, by
quitclaim deed dated February 22, 1850.

Joseph C. Dudley and his children derived title to these lands
from Harmon Dudley by his last will. The devise was in the
following words: "All my real estate not otherwise disposed
of in this my last will and testament, of every kind and
description, I give and devise to my nephew, Joseph Cyprian
Dudley, the son of my brother Joseph Dudley, to have and
to hold the same as an estate in tail to him, the said Joseph
Cyprian Dudley, and to the heirs of his body begotten; it
being my expectation and understanding that in the heirs of
the said Joseph Cyprian the same will become and be an
estate in fee-simple."

By this will an estate in fee tail was vested in Joseph C.
Dudley and a fee-simple absolute in his issue. The tenant

thereof, and the amount reasonably due to the plaintiff from the defend-
ant for the use and occupation of the premises; and if such value of such
improvements exceeds such amount due for use and occupation, final
judgment shall not be rendered until the plaintiff has paid said balance
to the defendant. But if the plaintiff shall elect to have the title con-
firmed in the defendant, and shall, upon the rendition of the verdict, file
notice of such election with the clerk of the court, the court shall ascer-
tain what sum ought in equity to be paid to the plaintiff by the defendant,
or other parties in interest, and on payment thereof may confirm the title
to said land in the parties paying it."

in tail died on January 15, 1877. A daughter, Ida E. Bragg, one of the plaintiffs in the ejectment suit, was born August 6, 1855. The interest of said Ida in said lands was not conveyed by either deed, and at the death of her father she owned an undivided fourth of the land now in question.

Joshua L'Hommedieu conveyed said land to the plaintiff and others, his partners in business, by warranty deed, dated December 6, 1850, subject to a mortgage of $450 to the state of Connecticut. This mortgage was quitclaimed on January 8, 1852; the land was remortgaged to the state to secure the payment of the same sum on January 2, 1852; and this last mortgage was quitclaimed on August 10, 1853.

On or about August 25, 1863, the plaintiff and his partners conveyed said land to Turner & Day, the plaintiff conveying by deed of warranty. On February 15, 1865, the said Turner & Day and Edward C. Hungerford, who had theretofore become a partner with the other grantors, conveyed by quitclaim deed the whole of the land in question to the plaintiff, who has ever since been in possession thereof, in the actual and *bona fide* belief that it was his actual estate in fee-simple.

In January, 1877, Henry W. Ely, Esq., of Westfield, Massachusetts, as attorney for Mrs. Bragg, notified the plaintiff of her claim of title to said property. At or about the same time, similar notifications were given to the other occupants of the land originally conveyed to Joshua L'Hommedieu, and which had now become subdivided, and was owned by 16 or 18 reputed owners. Much of the land was now improved. Dwellings, two factories, and a church were upon the property. These owners held a meeting, and appointed a committee or agent to examine the question of title. He employed counsel, who reported that the claim was entirely without foundation. The plaintiff consulted the same lawyer and received the same opinion. The committee visited Westfield, saw Mr. Ely and the relatives of Mrs. Bragg, and obtained the idea, from these and other conversations, that the claim would not be pursued, and that it was an attempt to extort money without right, and so reported to the plaintiff.

The plaintiff's factory was burned on October 15, 1878. He commenced rebuilding on November 1, 1878. The new building was completed about January 1, 1879. Before rebuilding he asked the same counsel whether there could be any doubt as to the validity of his title, and received answer that Mrs. Bragg had no valid claim.

On January 26, 1878, Mr. Ely offered to give a discharge from all the Dudley children to all the owners for $1,400. This offer was declined, and on February 21, 1878, Mr. Ely made a like offer of discharge for $500. On March 2, 1878, Mr. Bragg repeated this proposition, accompanied with the assurance that if it was not accepted suit would be commenced immediately. Suit was commenced on April 10, 1879.

Between December 6, 1850, and February 15, 1865, the owners of this property made repairs and some slight improvements thereon, but the improvements are so small that no account is made of them (except the portion of the permanent improvements upon the dam which may have been made by Turner, Day & Co.) until after the repurchase by the plaintiff in 1865. Since then the dam has been substantially rebuilt, additional buildings and a store erected, walls and a fence built, trees set out, and the brook straightened. After the fire a new building and foundation were built.

The testimony leaves no room for doubt that up to the date of the suit the plaintiff continuously believed that he was the absolute owner of said property from and after February 15, 1865, and that he had a perfect title thereto in fee simple, and that the claim of the defendants was without foundation. Neither is there any doubt that the plaintiff and his grantors made all their improvements upon said property, before the commencement of the action at law, in the like belief of absolute title, and in perfect good faith, in fact, both with themselves and towards any known or unknown claimants. These improvements are valuable, and have a present value in the enhancement of the price of said property.

The averments of the bill are found to be true, except as to the value of the betterments, and except as to the averment that a joiner's shop constituted one of the improvements.

This shop was erected upon the land by license of the plaintiff, with the right to purchase the same. That privilege has not yet been exercised.

In addition to the questions of fact in the case, the defendants contend:

*First.* That the plaintiff, holding merely under a quitclaim deed, cannot be a *bona fide* purchaser without notice.

It is true that in a class of cases in equity no person deriving title merely by a quitclaim deed is considered a *bona fide* purchaser, (*Oliver* v. *Piatt,* 3 How. 333; *May* v. *Le Clair,* 11 Wall. 217; *Dickerson* v. *Colgrove,* 100 U. S. 578;) but I do not think that this principle or these decisions are applicable to this statute. The questions under this statute of good faith and of belief are those of fact. Were the improvements made in good faith and in the belief of an absolute title? If they were in fact so made, the plaintiff is entitled to the remedy. By the words "good faith" I do not think that the legislature had in view an arbitrary rule that a particular kind of conveyance necessarily bars the existence of good faith in the purchaser. The statute was intended to be remedial, and to provide that if good faith and belief actually existed, the deeds not showing upon their face that an absolute title was not conveyed, and the purchaser not being chargeable with laches, then the equitable powers of the courts might be exercised.

*Second.* It is claimed that, inasmuch as the plaintiff rebuilt his burned mill after notice of the claim of Mrs. Bragg, he cannot be considered as having acted in good faith so far as subsequent improvements are concerned.

Prior to the Revision of 1875 the belief of good title was alone required. The statute now provides that the ejectment defendant shall also have made improvements in good faith. Mere belief of title is not sufficient. A wealthy occupant is not to make, without good reason, extensive improvements upon land which is to his knowledge earnestly claimed by another. The reputed owner must act in good faith; that is to say, fairly, considerately, in good conscience, with integrity of purpose, and without rash haste. But it may not be

inconsistent with his good faith that some person had at some time asserted a claim upon his property. The notice of claim may be a circumstance all-important, and it may be of trifling consequence.

In this case notice was given in January, 1877, of attack upon all the titles of land in a part of a village. The alleged defect was treated as of no consequence by competent lawyers who were consulted or who professed to give an opinion. The claim was virtually declared to be valueless by near relatives of the claimant. In January, 1878, her attorney offered to give a complete title to all the owners for $1,400, and in the succeeding month he made a like offer for $500. In March, 1878, this offer was repeated, with threat of immediate suit in case of non-acceptance, but no suit had been commenced when the plaintiff rebuilt in the fall and winter of 1878–9. Under these circumstances the plaintiff acted not only in good faith towards the claimant, but he had some reason to believe that she was acting in bad faith towards him.

The mere notice of adverse claim is not considered in other states which have statutes of similar general character to forbid the conclusion that subsequent improvements were made in good faith. *Harrison* v. *Castner*, 11 Ohio St. 347; *Wells* v. *Riley*, 2 Dillon, 569.

By agreement of the parties, the wheel and shaft connected therewith, and main line of shafting, and all machinery, fixed and movable, are excluded from the computation of the value of improvements, and the said machinery, fixed and movable, shafting, shaft, and wheel, are agreed to belong to said Griswold, and not to pass to said Bragg and wife by virtue of any judgment in the ejectment suit.

The present value of the improvements upon said land thus made by the plaintiff, excluding the value of the machinery by virtue of the foregoing stipulation, I find to be $6,100; one-fourth of which is $1,525. The amount due to the defendants by the plaintiff for the use and occupation of one undivided fourth of the premises for two years, one and one-half months, was found by the jury to be $112, or at the rate of $4.40 per month.

Let there be a decree for the plaintiff that final judgment shall not be rendered until the plaintiff in ejectment has paid the balance thus found to be due to the ejectment defendant.