# CASES

ADJUDGED IN

# THE COURT OF CHANCERY

## OF THE STATE OF NEW JERSEY.

### MAY TERM, 1868.

VEGHTE and others *vs.* THE RARITAN WATER POWER COMPANY.

. 1. Multifariousness and misjoinder of complainants must be objected to by demurrer, or plea, or by answer expressly for that purpose. Objection on such grounds comes too late at the hearing.

2. Proof of execution of a written instrument, shown to have been lost, will be supported by the fact of acquiescence in acts, which it must be held the party knew could not be done without such instrument having been executed by him.

3. Proof of the contents of a lost paper, by witnesses who have only read it once, and that twenty-seven years ago, is unsatisfactory evidence, even where the character of the witnesses is unimpeachable. It must be received, and when supported by circumstances rendering it probable, will be sufficient; but if shown by circumstances to be improbable, will be deemed insufficient; and a party claiming under an instrument lost by the negligence of himself, or those through whom he claims, will be required to produce satisfactory proof of its contents.

4. A right to divert the water of a river (owned on either side, and to

Veghte *v.* The Raritan Water Power Co.

the middle, and subject to no public right,) is an incorporeal hereditament, and can pass only by instrument, under seal.

5. The charter of a water power company, authorizing the company to divert the water of a river, upon the written consent of the land owners, does not dispense with the necessity of a deed or conveyance of the right in the form required by law. It confers the power, but not the title. Such consent is only a license.

6. In general, a license at law will create no estate in the lands of the licensor, but will justify or excuse any act done under it. It is revocable, even when given for a consideration, and after it has been executed. But in such cases, where the revocation would be a fraud, courts of equity give a remedy, either by restraining the revocation, or by construing the license as an agreement to give the right, and compelling specific performance by deed, as of a contract in part executed.

7. But a license to a person to do or erect something on his own land, by which a right or easement of the licensor may be affected, if once executed cannot be revoked.

8. The effect of a license to do an act on the land of the licensee can only extinguish such easement as may be abandoned, that is, easements or rights acquired by grant or prescription, and in no case affects easements or incorporeal hereditaments which are, by law, annexed to the land of the licensor, such as the right to running water passing over his land in a natural stream or water course.

9. An easement will not be extinguished by mere non-user for twenty years, unaccompanied by acts showing an intention of abandonment. In such case, adverse possession, as well as non-user, is necessary to effect the extinguishment.

10. A bill will be dismissed as to such complainants as, at the hearing, are decided to have no cause of complaint.

---

This case was argued on final hearing, upon pleadings and proofs. The facts of the case fully appear in the opinion of the Chancellor.

*Mr. Dodd* and *Mr. Bradley,* for complainants.

*Mr. Gaston* and *Mr. Williamson,* for defendants.

THE CHANCELLOR.

The suit is brought by seven complainants. The defendants are the proprietors of a dam across the Raritan river,

and a raceway leading from the dam, which discharges the waters from the pond above the dam into the river, some three miles below. The bill complains that the defendants are about unlawfully to raise and tighten their dam, and to enlarge the head-gates opening into the raceway, and that thereby the water above the dam will be raised, and the whole of the water of the river, or a larger part than heretofore, will be diverted from the natural channel of the river into the raceway. Two of the complainants own lands along the river, above the dam; four own lands below the dam, opposite the raceway; and one owns lands both above and below the dam. The injury to lands above the dam will be caused by the raising the dam and making it tight, and by that alone; the enlarging of the head-gates would not raise the water in the dam, but, on the contrary, would tend to lower it. The injury to the lands below the dam, which will consist in diminishing or taking away altogether the water flowing along them in the river, will arise from both causes.

The answer, after answering the whole bill, states these facts, and submits that the bill is multifarious, and prays the same benefit by reason thereof, as if a demurrer had been filed on that account.

The complainants are improperly joined in the same bill; those who own no lands below the dam cannot be injured by the enlargement of the head-gates. The fault is not what is properly called multifariousness; which depends more upon the subject matter of the suit than the parties to it, and consists in joining in one bill several matters perfectly distinct and unconnected, in part of which some of the parties have no interest. As to any of the complainants below the dam, the two matters are not distinct and unconnected; the damage to them is by the joint operation of the two alleged injuries.

But the rule of pleading in equity is the same in both cases. Both multifariousness and misjoinder of complainants should be taken advantage of by demurrer, or plea, or by answer expressly for that purpose. The court, at the

hearing, if the misjoinder or multifariousness is such as to prevent or impede the proper relief, will, of its own motion, dismiss the bill on that account. But the general rule is, that the defendant, by answering the matter of the bill, waives the objection, and cannot urge it at the hearing. It is not right that, by answering and omitting to demur, he should permit the complainant to take his testimony, and then, after the expense is incurred, take advantage of it on final hearing. The subjects are both proper matters for a special demurrer, which is an objection not to the merits, but the form of the suit. The dicta in many of the cases, and of the text writers, that these matters may be taken advantage of by answer, as well as demurrer, must be held to apply to answers for that purpose only; for it is a settled rule of equity pleading, that a defendant cannot answer and demur to the same part of a bill, and that an answer overrules a demurrer. 1 *Dan. Chan. Prac.* 570 *and* 615, *and notes, and* 791.

This rule would be nugatory if the answer could in all cases state the objection, and pray the same advantage as if taken by demurrer. The whole bill, or any part of it, could in this way be demurred to in an answer. This objection as taken here, is really a demurrer, and it is none the less so because written on the same sheet, between the paragraphs of the answer, instead of being engrossed and filed as a separate paper. In this case especially, where the testimony, amounting to nearly four hundred printed pages, has been taken at great expense of time and money, it would be oppressive now to dismiss the bill, on grounds which the settled practice of the court very wisely and properly provides should be disposed of on demurrer. By this course, the complainant would, by the act of the defendant, be deprived of the right of having the formal objections to his bill settled before taking the testimony, and disclosing his whole case. 1 *Dan. Chan. Prac.* 352 ; *Story's Eq. Pl.*, § 284 *a.* 539 ; *Ward* v. *Cooke*, 5 *Madd.* 122 ; *Wynne* v. *Callander*, 1 *Russ.* 293 ; *Greenwood* v. *Churchill*, 1 *M. & K.* 546 ; *Oliver*

v. *Piatt*, 3 *How.* 333 ; *Nelson* v. *Hill*, 5 *How.* 127 ; *Swayze* v. *Swayze*, 1 *Stockt.* 273 ; *Story's Eq. Pl.*, § 283 *and* 544 ; 1 *Dan. Chan. Prac.* 304 ; *Watertown* v. *Cowen*, 4 *Paige* 510.

The Somerville Water Power Company were incorporated by an act passed February 28th, 1840, which authorized them to build a dam across the Raritan river, at the place where they have constructed it. It was provided by the act that the dam should not raise the water more than two and a half feet above its ordinary level, and that the company should be liable to the owners of lands above the dam for all damages arising from overflowing or back-water. It authorized the company to construct a raceway from above the dam to a point in the river some miles below ; and when the raceway should be completed, it authorized them to divert the waters of the river, or so much as should be necessary for the water power created by the act, into the raceway ; but such diversion was not to be made until they should have obtained the written consent and permission of the owners of all lands lying on the river between the dam and the point where the raceway should again intersect the river.

The persons who were incorporated by this act had for more than a year previous, under articles of association, been engaged in making contracts for carrying out the purpose for which they were subsequently incorporated, which was, to create a water power by a dam and raceway, by which the whole fall of the river for miles might be taken advantage of, and the power concentrated at one spot, where a manufacturing village would be established, and factories built to use the power thus created. They had made contracts for the lands on both sides of the river where the dam is built, and for those to be occupied by the raceway which is on the north side of the river, and had commenced excavating the raceway, and built head-gates at the place where it was to connect with the river, above the dam. These head-gates were built in 1839, and finished in that year, or within a short time after its close ; they were shortly after washed out by a freshet, and lay down the whole winter,

the space in front of them being filled in with flax, tow, and other materials. This was the situation of the raceway and head-gates when the associates became incorporated; upon this they transferred all their property, contracts, and rights to the company. The dam, if commenced at all, was barely begun, and was not finished until 1842, in which year the raceway was completed so as to let the water in for the first time. In 1841 or 1842, two small culverts, with an area amounting to thirteen square feet in the opening of both, were placed in the north bank of the dam, below the surface, for the passage of the water from the dam or mill pond into the raceway; in 1843, these were replaced by two other culverts, which consisted of boxes or trunks made of plank, thirty feet long, three feet wide, and four feet high, each, extending from the pond to the raceway, and one or two feet below the ordinary height of the water in the dam. These last mentioned culverts have remained until the present time, and have been the channel by which the water has passed from the river above the dam into the raceway, from 1843 until the present time. The dam was built by placing three cribs of timber filled with stone, running parallel to each other, across the river, and connecting them with timbers, and raised by layers of timbers to its requisite height. The frequent freshets to which that river is subject, repeatedly swept out the stones and gravel under the dam and from between the cribs; these injuries were from time to time more or less perfectly repaired, and in this manner the dam has been in an imperfect and leaky condition for a great part of the time since its erection. The comb of the dam was covered with plank, which projected about eighteen inches beyond its lower edge, the slope of the plank being such as to rise about four inches in this projection. The two ends of the dam seem to remain in their original position, at least there is no sufficient evidence to show that any change has taken place, but the middle of the dam has sunk, and the planking on the comb has worn away, and by repairs made at different times—some just before the com-

mencement of this suit—it has been raised to what the defendants contend is its original height, and there is no evidence to show that the height to which it is thus raised is beyond its original height.

The Somerville Water Power Company, in 1848, mortgaged their property, franchises, and contracts to trustees, to secure to the holders of fifty bonds, for $1000 each, the payment of these bonds. This mortgage was foreclosed in the Circuit Court of the United States, and the mortgaged property was, by virtue of said decree, on the 27th day of February, 1864, sold and conveyed by the marshal to the holders of the bonds. The defendants had been incorporated by an act passed March 24th, 1863, and the purchasers at the marshal's sale, in March, 1864, conveyed the property to the defendants. The defendants, by their charter, were authorized to purchase the property and franchises of the Somerville Water Power Company; but that company were not authorized by their charter to mortgage or sell their franchises. For that, special legislation was necessary; for this water power company is not included in the act of March 5th, 1858, (*Nix. Dig.* 791, § 36,) by which, upon a judicial sale of the main works of a railroad or canal company, or a turnpike or plank road company, the franchises pass to the purchasers.

The defendants, to increase the efficiency of their water power, were making preparations to put the dam in thorough repair, and to tighten it, and stop all the leaks in it. They allege that the dam never has been tight, and that in its present condition one-third of the water of the river, at its ordinary stages, and one-half, in times of drought, percolates through it. They were also preparing and intended to change and enlarge the head-gates. Their plan was to extend the raceway higher up the river, and at such higher point to construct two head-gates, each one foot wider than the present culverts, so as to pass more water from the river through the raceway, for the use of the mills at the lower end of it.

In this situation, the complainants filed their bill for permanent relief, and an injunction was ordered to restrain the proposed works until the determination of this suit. Those of the complainants who own lands above the dam, complain that the raising and the proposed tightening of the dam will raise the water above the dam and injure their lands. Those who own lands below the dam, complain that raising and tightening the dam will divert more of the water of the river, and deprive them of the use and advantage of its flow. The defendants, in their answer, allege that the owners of these lands above the dam, after the dam was built and erected, by deeds for valuable consideration, granted to the Somerville Water Power Company the right to maintain the dam as built, and released all claim for injury or damages occasioned by maintaining it, and they produce these deeds in evidence, and sustain fully this part of their answer.

As to the owners of lands on the south side of the river, between the dam and the end of the raceway, the answer insists that the owners of these lands in 1839, from whom these complainants derive title, gave to John I. Gaston and his associates, who were the original Somerville Water Power Company, their written consent to erect the dam, and to divert the whole of the water of the river, or so much as they might deem necessary for their purpose, into this raceway; and they insist that the act of the legislature, and this consent, gave the right to divert the whole of the waters of the river, as against the parties who signed the consent, and all claiming under them; that this right was property, and passed by the mortgage and foreclosure sale.

This alleged written consent is lost, and the fact whether it was ever given is disputed, and is one of the most difficult questions in the cause. It is alleged that it was signed by Peter B. Dumont, who then owned the lands which the complainants, F. T. Frelinghuysen and T. Hope, now own; by Catharine Veghte, who then owned the lands now owned by the complainant R. H. Veghte; by John and Garrett Van

N *

Middlesworth, who then owned the lands now owned by the complainant A. P. Stryker; and by Willet Taylor, who owned the land now owned by the complainant Eli Crater. The loss of this written consent is sufficiently proved to entitle the defendants to give parol evidence of its contents. There is no positive direct proof of its execution by Catharine Veghte or the Van Middlesworths. From the fact that they acquiesced in the erection of the dam, and the diversion of the water, which it must be held they knew could not be diverted without their consent, and from other circumstances proved, tending to show that they had signed it, it must be presumed that they did. Dr. Davis proves that it was signed by Willet Taylor, whose handwriting he knew; Theodore Frelinghuysen proves that it was signed by P. B. Dumont. Both these witnesses give evidence of its contents. They do not profess to recollect the words, but give the effect and general terms of it. Neither of them saw it but once, and that, in both cases, about twenty-seven years before they gave their evidence. I am not at liberty to reject this evidence, but proof of the contents of a lost paper by witnesses who have only read it once, at such a distance of time, is the most unsatisfactory kind of evidence. Both witnesses are unimpeachable, and entitled to credit; for I do not consider the credibility of one of them affected by the fact that he may have stated to one of the complainants that it was possible he might have been mistaken as to the paper, nor by the fact that he does not recollect that conversation as this complainant does. I must consider it as proved that Dumont and Taylor signed some paper containing a consent to the erection of the dam, and to some diversion of the water of the river. I do not think that the improbability of Dumont's giving such consent, is, from the evidence, so great or well established as to overcome the positive proof of these witnesses. He, no doubt, regarded the river as important to his large landed property, but it is shown that the water in the river was too high for his meadows, and that such was his settled opinion. He re-

garded the Dawes dam below him as a great injury, and as the project of the associates might relieve him from that dam, and the excess of water on his lands, it is not improbable that he would consent to it in some shape. But it is very improbable that he would give an absolute, unqualified consent to divert all the water in the river, so as to leave in its place a dry channel, with here and there a pool of stagnant water, at the seasons of the year when stagnant pools are most noxious to health, and deprive his home and farm of the ornament and benefit of a running stream of water. Neither of these witnesses profess to remember the whole of the contents of that paper. It may have contained provisions that one-third or one-fourth of the stream, or that sufficient for all purposes of use and ornament, should be permitted to run in the natural channel. And such qualifications would not be so much noticed, or so well remembered, by these witnesses, whose attention was evidently directed to the main object or effect of the paper, which was, that it rendered the construction of the works possible. Did the question of the right to divert the whole of the river depend on this paper, I should be unwilling, upon such evidence of its contents, to deprive the complainants of their natural rights. The difficulty is owing to the negligence of the defendants, or those through whom they claim, in losing a valuable paper, on which their title depended. They must take the consequence of that negligence, and where there is a serious doubt it must be determined against them. I do not believe, from the evidence before me, that a man of the intelligence and character of Mr. Dumont signed such consent without qualification.

But admitting that such consent was signed, did it, either alone or in connection with the act of 1840, create a title in the associates or the company to divert, at their pleasure, all the water in the river?

This river was not a public river. The owners on each side owned the soil to the middle of the river, subject to no public right, and had the right to have the waters flow in

their natural channel, along and over their lands. This right was an incorporeal hereditament, not acquired by grant or prescription, but by law annexed to the land. An incorporeal hereditament of any kind, cannot, at common law, be created or conveyed but by deed. It is a matter that, in legal language, lies in grant, and cannot be created or transferred, as lands could be, by livery of seizin. Such a consent then, not sealed, even if now before us in writing, would not give the right to divert the water.

But the common law may be altered by statute, and it was in the power of the legislature, either by general law or by this charter, to have ordained that such rights might be conveyed or created by writing without seal. It is contended that this act, by correct construction, gives such effect to this consent. The act simply authorizes the company to divert the water of the river; it gives to them a power and capacity which they would not have without it, like a power to buy, mortgage, and sell lands, and the other powers specially conferred by this charter. It defines one object and purpose of their incorporation. But like all other objects and powers, it is to be executed in the manner prescribed by law; it was not intended to dispense with a deed as the means of conveyance, any more than a power given to a charitable corporation to take property by bequest or devise, would dispense with the necessity of the will being executed with the forms required by law.

The legislature did not intend to give the right of taking property by condemnation. In the exercise of the power of eminent domain, the act, in its preamble and its provisions, provides for the consent of the owners. The act here is dealing with private property. It uses no words apt or proper to divest it from the owners, or to vest it in the company. It uses words apt and proper to grant power to a corporation to do a certain act as part of the franchises granted to them. In such case the powers granted are to be strictly pursued, and not to be extended, by implication, beyond the usual meaning of the words. The proviso to

this grant cannot extend it. It was intended to limit it. It prohibits the diversion until the written consent and permission of the land owners should be obtained. It does not expressly, and ought not to be held by implication, to give the right of property in these waters by a written consent, without seal, and not in the form of a grant.

This question has, in effect, been settled in this state, by the decision in the Court of Errors, in the case of *Hetfield* v. *The Central Railroad Company*, 5 *Dutcher* 571. In that case the charter of the railroad company, which authorized them to enter upon and take the lands required for their road, directed that they should not enter without the consent of the owner. The company had entered and built their road, with the consent of the owner. And the court held, that this did not dispense with the necessity of a deed or conveyance of the land or right in the form required by law in like cases, that it was not intended to confer title. That decision must control this case. And this charter must be held not to change in this case the settled principle that an incorporeal right or easement cannot be created or transferred except by deed.

The consent in such case is only a license, and will have the effect given to a license, at law or in equity. In general, a license at law will create no estate in the lands of the licensor, but will justify or excuse any act done under it. It is revokable, even when given for a consideration, and after it has been executed. *Wood* v. *Leadbitter*, 13 *M. & W.* 838. But in such cases, where the revocation would be a fraud, courts of equity give a remedy, either by restraining the revocation, or by construing the license as an agreement to give the right, and compelling specific performance by deed, as of a contract in part executed. *Angell on Watercourses*, § 318, 322; *Wetmore* v. *White*, 2 *Caines' Cas. in Error* 87; *Hulme* v. *Shreve*, 3 *Green's C. R.* 116; *Le Fevre* v. *Le Fevre*, 4 *S. & R.* 241; *Rerick* v. *Kern*, 14 *S. & R.* 267.

But a license to a person to do or erect something on his own land, by which a right or easement of the licensor may

be affected, if once executed cannot be revoked.   3 *Kent* 452; *Angell on Watercourses,* § 296 *and* 308; *Washb. on Easements* 559, § 1; *Liggins* v. *Inge,* 7 *Bing.* 682; *Winter* v. *Brockwell,* 8 *East* 308; *Dyer* v. *Sanford,* 9 *Metc.* 395; *Morse* v. *Copeland,* 2 *Gray* 302.

This effect given to a license by parol or by writing, without seal, seemingly contrary to the principle of law that a right to an easement can arise or pass by deed only, is said by some to be founded on the doctrine of abandonment.   It is settled, that an easement or right in the estate of another, acquired by grant or prescription, may be lost by actual abandonment, that is, by a non-user for twenty years, or even for less time, accompanied by acts which show an intention not to resume it.   And it is said that the effect of a license to do an act on the land of the licensee, can only extinguish such easement as may be abandoned, that is, easements or rights acquired by grant or prescription, and does in no case affect easements or incorporeal hereditaments, which are, by law, annexed to the land of the licensor.   *Angell on Watercourses,* § 303; *Fentiman* v. *Smith,* 4 *East* 107. Of this kind, is the right to running water passing over or along his land in a natural stream or watercourse.   It is creating an easement in, or parting with, a right annexed by law, not giving up or abandoning a right acquired by grant or prescription.   I am much inclined to think that the last is the correct doctrine.

But, as applied to one branch of this case, this question is of no importance.   So far as the license is not executed, it can now be revoked, and it has been revoked; it would be revoked by the filing of this bill; it was revoked, long ago, by the death of P. B. Dumont and the other licensors, and by the alienation of the lands which it affected.   It will not authorize any raising of the dam or water in the river, or any greater diversion of that water by a raceway or gates of greater capacity than such as were erected and put in operation while the license was yet in force and unrevoked. Peter B. Dumont died in 1846.   Nothing done by virtue of

his license, after that time, can affect the present owners of the land owned by him at the giving of the license.

This makes the question whether the license could be revoked in this case, after acts done by virtue of it on the lands of the licensee, of little or no consequence in this suit. Dumont died twenty years before the filing of this bill, and erections made under the license from him, either of a dam to hold back the water, or of a raceway and head-gates to divert it from the channel, had, by time and adverse enjoyment, ripened into a right which cannot now be affected by any revocation. Besides, the expense incurred in this case, on faith of the license, would make it a fraud to revoke it now; and even if revoked at law, a court of equity will grant no relief by injunction founded on such revocation.

Had the dam and raceway been erected without license, and enjoyed adversely for twenty years, the right to continue them, as enjoyed, would be established at law. The claim to erections made under a license, is better for the defendants than a claim by mere adverse enjoyment, as it will give a right to such works as they erected and put in operation before 1864, notwithstanding they may not have been kept up to the full extent of their erection, provided there was no actual abandonment of them, or any substantial part of them; whereas, the claim by adverse enjoyment requires that they should show a substantial enjoyment and occupation, to the extent claimed, for twenty years, excepting intermissions caused by accident or temporary neglect of repair.

It becomes, then, important to determine to what extent these works were erected before 1846. The license was for two purposes: to erect a dam, and divert the water of the river in the raceway. The dam was erected before 1846, and was erected of the height which it now is. There is no evidence that shows it has been raised, or that the height at which it now is by the recent repairs of the defendants, is greater than its original height, or that it raises the water more than two and a half feet above its former level. It is

the identical structure first placed there, and unless there is proof that it has been raised, it must be presumed to stand at the same height. When originally built, it was constructed and intended to retain all the water of the river, except what flowed over it. The license to erect a dam of that height was a license to erect a tight dam. From imperfections in its construction, from the nature of the ground, or the freshets peculiar to the river, or from all combined, together with the embarrassments, poverty, and mismanagement of the owners, it has been frequently, if not the greater part of the time, out of repair, and the waters of the river, to the extent of one third or one half, have leaked or percolated through and under it; but the owners never did anything that indicated an intent to abandon it, or any part of it. To what extent the dam interfered with the rights of the complainants for twenty years continuously, would be an important question if the claim to maintain it depended on adverse enjoyment only. But under the license, the right was perfect when the work was completed, and is not affected by any *cesser* or diminution of enjoyment, which does not amount to an abandonment. An easement will not be extinguished by mere non-user for twenty years; it will, if the non-user is accompanied by acts which show an intention of abandonment. Otherwise, it requires adverse possession, as well as non-user, to effect the extinguishment; as, if the land used for a way had been built upon, enclosed by an impassable wall, or cultivated in such way as to render the use of it impracticable.

Some hold, that a way acquired by prescription will be extinguished by non-user alone, while it requires adverse possession in case of a grant. I do not find any decision founded on this distinction, and it would seem unfounded, as prescription is based upon the presumption of a grant. 3 *Kent* 448 ; *Angell on Watercourses*, § 252 ; *Washb. on Easements* 550, § 1 ; *Ward* v. *Ward*, 7 *Exch.* 838 ; *Jennison* v. *Walker*, 15 *Gray* ; *Bannon* v. *Angier*, 2 *Allen* 128 ; *Ar-*

*nold* v. *Stevens*, 24 *Pick.* 106 ; *Shields* v. *Arndt*, 3 *Green's C. R.* 234.

For these reasons, I am of opinion that the defendants have the right to maintain the dam at its present height, and to repair it so as to make it perfectly tight. As the complainants, Wever and John Veghte, have no cause of complaint, except from the height or tightening of the dam, the bill, as to them, must be dismissed.

The other branch of the license was the diversion of the water of the river through the raceway. We must ascertain what diversion was made, or works erected and put in operation for the purpose, before 1846. These works were erected and the diversion made on the lands of the defendants, then belonging to the parties who erected them, under whom the defendants derive title. The authorities all agree, that if any work erected on such license is torn down, or is destroyed by the elements, the license may then be revoked, and after such revocation, it cannot be rebuilt without a new license. This principle will put out of the question the first large head-gates, erected in 1839, which were washed away by a freshet before the raceway was completed. The license having been revoked in 1846, those or others of the same capacity, cannot now be put in their place by virtue of the license. The same result would follow from the fact that the works were never completed so as to divert water, until after the destruction of these first head-gates; they were placed there in 1839, and washed away in that year, or in 1840. The raceway was not completed, so as to let in water, until 1842. The license was not to erect head-gates or construct a raceway, but to divert water. And only the erection, as a whole, of some work intended to divert the water, is such acting upon it as will make it irrevocable. Any experimental or tentative erections, afterwards given up, will not be considered as an execution of the license.

The outlet for the water from the river above the dam into the raceway, at the completion of the works in 1843, was the same two trunks which now remain there, made of

plank, thirty feet in length, four feet high, and three feet wide, about two feet below the surface of the water in the river above the dam. As to this fact there is no dispute; these trunks have never been altered in size or position. The raceway, so far as shown by the evidence, remains in the same condition as it was from 1843 to 1846, as to its capacity to divert water. The capacity of the works, as they were at that time, to divert the water of the river, is the test of the defendants' rights. They have the right to repair them, to clear them out, and to put them in as good condition as when first constructed, or as they were at any time before 1846, but they have no right to do anything by which their capacity to divert the water of the river is increased. They have no right to affix to the trunks any of the hydraulic contrivances, by which the influx or efflux of the water is increased. They have no right to change their height or position, so as to affect the flow of the water ; any change which does not increase the flow they may have a right to make; but such change will be watched and guarded with jealousy. They have no right to alter their raceway, either as to the level of its bottom, or to affect the level of the surface of the water in it, so as to increase the flow of water through these trunks. If the level of the water in the race, by increasing the use of the water at the end where it is applied to create power, disturbs the level of the surface, so as to draw more water from the river, it is a legitimate use of the raceway ; it is the effect of the object and purpose for which it was created.

I have arived at this conclusion, supposing from the evidence, that the diversion of water from the river by these means will not, even in times of drought, divert all the water of the river, or nearly all, but will leave a sufficient quantity of water flowing in the channel below the dam to maintain at all times a running stream, with sufficient water for the use of the complainants owning lands below the dam, and those who may occupy them, for all agricultural and other useful purposes for which they have been used. I am not

willing to determine and adjudge from the testimony before me, that the owners of these lands signed an unqualified consent to divert all the waters of the river, or to make any decree founded on such assumption. It would be more satisfactory, if I had anything to found the numbers or proportion on, to fix a certain proportion of the water of the river, as one fourth or one sixth, that should be allowed at all times to flow in the channel; but any designation of such proportion would be an arbitrary assumption, not founded on any fact before me. It might be right to make such assumption, as against the defendants, by whose negligence the paper presumed to contain the limitations has been destroyed.

As against the complainants, R. H. Veghte, Hope, Stryker, Carter, and Frelinghuysen, the defendants must be perpetually restrained from enlarging or in any way altering their head-gates or raceway in such manner as to divert any greater quantity of the water of the river than will be diverted by them as they now are, when repaired and cleared from obstructions that have accumulated in them since their original construction.