PLUMMER v. SIMMS et al.    (No. 5379.)†

(Court of Civil Appeals of Texas. San Antonio. Jan. 27, 1915. On Motion for Rehearing, June 25, 1915.)

1. EVIDENCE ⟨key⟩450 — PAROL EVIDENCE TO VARY WRITING—AMBIGUOUS CONTRACTS.

Clauses 3 and 4 of a contract under which plaintiffs were to sell lands for defendant provided that of the first cash payment above the amount which defendant was required to pay to his vendor $2, per acre should be applied towards the payment of plaintiffs' sales agent, $1.75 an acre in full payment of expenses by plaintiffs, except items therein specified, and the balance should be equally divided; that expenses incurred by defendant in surveying, platting, etc., and the commissions due plaintiffs' agents should be borne equally upon final settlement; that at the expiration of the contract or when all the land was sold there should be a full settlement; that defendant should receive $13 an acre for all land sold, and, in addition, certain advancements; and that the remainder of the proceeds should belong to the parties jointly. The contract was to continue until July 1, 1910, unless previously canceled, but it was provided that defendant might cancel it on January 1, 1910, and clause 12 provided that, if it should be canceled, any settlement between the parties should be based on the number of acres of land sold, and no liability should rest against either party in favor of the other on account of unsold lands. Held, that the contract was ambiguous as to whether, in case the contract was canceled, the expenses referred to in clause 3 should be borne equally or prorated on the basis of the number of acres sold, and evidence was properly admitted to explain the intention of the parties, this not varying the terms of clauses 3 and 4, as they dealt with a contract whose terms had been fulfilled.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2066–2082, 2084; Dec. Dig. ⟨key⟩ 450.]

2. CONTRACTS ⟨key⟩176—QUESTIONS FOR JURY.

The contract being ambiguous as to the manner in which the expenses should be borne upon a cancellation of the contract, the court properly submitted the question as to the intention of the parties to the jury.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 767–770, 917, 956, 979, 1041, 1097, 1825; Dec. Dig. ⟨key⟩176.]

3. PLEADING ⟨key⟩129—MATTERS TO BE PROVED —ADMISSIONS BY FAILURE TO DENY.

Where, in an action for amounts due plaintiffs on account of sales of lands under two contracts with defendant, the petition alleged that both contracts had been canceled, and the answer did not deny this, and it was apparently undisputed, proof of the cancellation of one of the contracts was unnecessary.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 270–275; Dec. Dig. ⟨key⟩129.]

4. CONTRACTS ⟨key⟩170—CONSTRUCTION OF CONTRACT—MEASURE OF COMPENSATION.

A contract under which plaintiffs were to sell lands for defendant provided that forfeit money on sales that were not completed should be divided, one-third to each of the contracting parties, and one-third to plaintiffs' sales agent. In an action for amounts due on account of sales defendant requested a charge that, in determining the number of acres sold, the jury should take into account the number of acres contracted to be sold upon which earnest money was collected. Held, that the parties had fixed their own measure of adjustment with respect to the forfeit money, and there was no merit in an assignment of error with respect to such instruction.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 753; Dec. Dig. ⟨key⟩170.]

5. ASSIGNMENTS ⟨key⟩138—ACTIONS FOR COMPENSATION—SUFFICIENCY OF EVIDENCE.

In an action for amounts due plaintiffs on account of sales of land under a contract with defendant, evidence held insufficient to require the submission of the question whether plaintiffs had assigned the contract to a corporation having the same name as the trade-name under which they were required to do business, and an assignment of error complaining of the failure to submit such question would be overruled, especially as the auditor's report was not excepted to as improperly stating the account or on the ground that there was no money due and owing plaintiffs because of such assignment.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 235–238; Dec. Dig. ⟨key⟩138.]

On Motion for Rehearing.

6. BROKERS ⟨key⟩75—ACTIONS FOR COMPENSATION.

L. sold land to defendant by a contract providing that, when a specified amount was paid, a deed would be made retaining a vendor's lien to secure notes maturing at different dates. The lien was to be released on any land sold by defendant on the condition, among others, that the purchasers' notes should be delivered to L. as collateral; the contract providing that payments on such notes should be retained by L. and credited to defendant. A contract with plaintiffs by which they were to sell the land for defendant made the L. contract a part thereof, and provided that at the expiration of the contract there should be a complete settlement, and if any of the purchasers' notes remained pledged with L. plaintiffs' share therein should be set apart and held by L., subject only to the pledge, defendant's interest in the pledged notes to be first exhausted in payment of L.'s debt. Defendant, as authorized therein, canceled the contract with plaintiffs, and no settlement ever was had. L. executed a deed to defendant, and it did not appear that the notes called for by L.'s contract were not executed. Defendant sold the purchasers' notes held by him, applied the proceeds on his notes to L., and arranged with a trust company to take up his indebtedness to L. The last of the L. notes, if in accordance with the contract, would have matured on June 10, 1913. Plaintiffs on May 6, 1913, sued defendant for the amounts due

them, and recovered judgment in May, 1914. *Held* that, defendant having sold the purchasers' notes, and the judgment having been rendered after his indebtedness to L. should have been paid, he could not be heard to say that the time for payment to plaintiffs had not arrived, as there was nothing in the contract postponing, until the payment of the L. debt, plaintiffs' collection of their share of the proceeds of notes paid or sold, and defendant could not, by his failure to pay the L. debt at maturity, delay a settlement with plaintiffs.

[Ed. Note.—For other cases, see Brokers, Dec. Dig. ☞75.]

Appeal from District Court, Bexar County; W. F. Ezell, Judge.

Action by H. F. Simms and another against Theodore Plummer. From a judgment for plaintiffs, defendant appeals. Affirmed.

Terrell, Walthall & Terrell, of San Antonio, for appellant. Houston, Boyle & Storey, of San Antonio, for appellees.

CARL, J. H. F. Simms and J. J. Harrison, appellees, sued appellant, Theodore Plummer, to recover $12,900, alleged to be due appellees on account of sales of certain lands in Bee and Karnes counties, Tex., belonging to appellant, under and by virtue of sales contracts they had with Plummer. One of the contracts was dated March 31, 1909, and covered 18,720.5 acres of land known as the Lott ranch, in Bee county; and on July 10, 1909, the other contract for the sale of 640 acres known as the Word section was made. These contracts were made by Wm. Simms, on behalf of his firm, a copartnership known as Simms, Harrison & Simms. Under the terms of these contracts, Plummer had the right to cancel the same January 1, 1910, if he was not satisfied with the sales being made, and he did cancel them on that date.

The petition alleges that they sold 2,259 acres of the land under the contracts, and that there was due them $15,764.84 out of such sales at the time of the cancellation of the contracts, but that appellant was entitled to charge against them their pro rata of the expenses incurred as provided in said contracts, which expenses amounted to $5,-588.91, thus leaving a balance due appellees in the sum of $9,260.97. It is also alleged that at the time the contract was canceled purchasers of said land had given notes aggregating more than $20,000, and that after payment of expenses Simms, Harrison & Simms were to have an undivided one-half interest therein, but that such notes might be pledged by appellant to secure his indebtedness due the Lotts for purchase money of the land, provided that the interest of Simms, Harrison & Simms in said notes should be designated and set apart to them as between them and the said Plummer, and kept and held by the then holders in escrow for the use and benefit of Simms, Harrison & Simms, and that both parties should join in an application to have some bank in Beeville made a depository for all of said notes, which

would hold same until the debt for which the same were pledged should be paid off, at which time appellees were to receive their part of the notes and interest accruing thereon. It is alleged that appellant failed and refused to deliver these notes to a bank in Beeville or to appellees, but converted same to his own use and paid the Lott debt with same. Claim is further made for the sum of $2,380.60 in cash as the plaintiffs' share of forfeit money which it is alleged Plummer converted to his own use.

The answer admitted the contract and practically the sales made and forfeit money received, but denied conversion of the plaintiffs' interest in the notes, claiming that, under the contract with the Lotts which was made a part of the sales contract, said notes were not to be divided until the Lott or purchase-money debt was paid, and alleged that same had not been paid. Defendant also pleaded that the Simms contract was assigned to the Simms Colonization Company, a Kansas corporation which had not complied with the laws of Texas by filing a copy of its articles of incorporation with the secretary of state of Texas and obtaining a permit to do business in Texas; that whatever service was performed was by that corporation, and that same constituted doing business in Texas, and it could not maintain this suit; further, that by reason of the assignment of said contract plaintiffs had no interest in the notes, and could not maintain the suit. Defendant alleged that the sales so made by the Simms Colonization Company amounted to $1,999.11, and that under the contract the Colonization Company was entitled to receive, exclusive of commissions to agents, $14,762.91, less advances to the said corporation and to Simms, Harrison & Simms, including advances for subdivision, operating expenses, and interest thereon, etc., which it was alleged aggregated $13,500, leaving a balance of approximately $1,261. This amount it is claimed plaintiffs could not recover because of the assignment of the contracts to the corporation.

Plummer alleged that $23,205.75 in purchasers' notes were delivered to him, and under the terms of the Lott contract—his contract of purchase which was made a part of the sales contract—were turned over to Lott, Pittman, and others to be held as collateral security for the purchase money for the land, and admitted that, after the payment of the debts the notes were turned over to secure, and operating expenses were paid, the plaintiffs were entitled to an undivided one-half interest in the notes, subject to the pledge of the notes aforesaid, but that under the assignment Simms Colonization Company succeeded to whatever interest the plaintiffs had. Defendant admitted that the interest of plaintiffs or Simms Colonization Company in said notes had never been turned over to them, and that no application had ever been

made to a Beeville bank to act as depository of the notes, but alleged that all of the notes were delivered to him, and in turn delivered to the Lotts and Pittmans in accordance with the purchase contract for the land, and alleged that the purchase-money debt had never been paid off, but merely transferred and taken up by Central Trust Company of San Antonio.

The trial before a jury resulted in a verdict and judgment for $6,964.54 in favor of H. F. Simms and J. J. Harrison. It may here be said that Wm. Simms sold his interest prior thereto to H. F. Simms.

As the main points of this controversy hinge on the proper interpretation of the contract between the parties, it is necessary to set out the following paragraphs of that document:

"(1) The second parties and each of them agree to begin at once and thoroughly and extensively advertise and push the sale of said lands, devoting their exclusive attention thereto, and sell the same as rapidly as possible.

"(2) The lands are to be sold by the second parties at a scale of prices to be hereafter agreed upon between the parties, in writing, and no subdivision thereof to be sold at less than the scale price mentioned thereon, and the scale price of no subdivision shall be for less than $18.00 per acre. The terms and conditions of each and every sale or contract of sale of *very* tract or part of said land shall be in strict compliance with the terms, conditions, and provisions of said contract of purchase owned by the first party, unless herein otherwise provided for sale of ten-acre tracts, a copy of which is hereto attached and marked 'A,' as before said. In other words, all of the terms, provisions, and conditions of said contract attached and marked 'A,' in so far as the same were meant and intended to obligate and control the first party in selling and contracting for sale any part of said lands, and securing releases of the parts of said land sold, shall rest against and govern and control the second party in making sales thereof, except in case of ten-acre tracts, hereinafter provided for, until all the obligations against the first party which are secured by lien on said lands, as recited in said contract marked 'A,' have been fully paid off and discharged, after which to be made on terms mutually agreeable to the parties hereto during the life of this contract.

"(3) That part of the first cash payment made by each purchaser of any part of said land from second parties (except ten-acre tracts) over and above the amount thereof provided to be paid by first party on the purchase price by him on said land, as specified in said contract of purchase attached and marked 'A,' which shall be paid to the first party, shall at once, and as soon as collected, be deposited with the bank, to be designated as the depository, to the joint credit of both parties hereto, and shall be disbursed as follows:

"(A) An amount thereof equal to $2.00 per acre on the land sold in each instance to be applied by second parties towards paying part of what they may owe their agent in such instance for making the sale, and when any purchaser pays first due of the notes given by him on any part of the purchase price to him of the tract of land purchased by him, the agent making such sale shall be entitled to the balance of his commission, to wit, $1.00 per acre, which said sum, in which event, first party agrees and binds himself to advance and pay to said agent of second parties, provided there be no money on hand from sale of ten-acre

tracts to meet second parties' deferred obligations to agents.

"(B) An amount equal to $1.75 per acre on the land sold in such instance to be paid second parties, which second parties agree to accept in full payment for all expenses, except the following items of expense: (1) Expenses heretofore incurred by first party, or the Simms Colonization Company, to date, in surveying and platting and cutting roads, and the moneys expended and debts incurred by the Simms Colonization Company for expenses while operating under contract of September 7, 1908, which first party agrees shall not exceed $9,000, as well as expenses to be hereafter incurred by the first party for surveying, clearing, platting, and getting lands ready to put on the market, which first party is to do when necessary; (2) the commissions due agents of second parties, not to exceed $3 per acre, except in sale of ten-acre tracts, hereinafter provided for. The items of expense enumerated in paragraphs 1 and 2 next above shall, on final settlement, be borne equally, one-half by first party, and one-half by second parties.

"(C) The balance of the first cash payment, if any, paid by each purchaser (except in case of ten-acre tracts) to be at once divided equally, one-half to first party, and one-half to second party.

"(4) At the expiration of this contract, or when all of said land has been sold, if sold before this contract expires on its face, there shall be a full and complete settlement between the parties on the following basis, which shall constitute the basis of their rights therein:

"(A) First party to receive an amount equal to $13.00 an acre for all of said land sold by second parties during the life of this contract, and in addition thereto, receive the amount due him for any moneys previously advanced by him or by the Simms Colonization Company (corporation) to second parties, including all moneys advanced and to be advanced by first party, and said Simms Colonization Company (corporation) to survey and prepare said land for sale, together with 6 per cent. interest thereon per annum from date of several advancement, and of the remainder of the proceeds of all sales made by second parties, whether the same be in the shape of notes or cash, shall belong jointly, one-half to the first party and the other half to the second parties herein, and if any of said notes then remain pledged to secure any part of the obligations of the first party, which obligations are secured by lien on the said lands of the 'Lott' ranch, in keeping with the terms of the contract hereto attached, and marked 'A,' then the amount of the share and interest of the second parties, if any, thus pledged, shall be designated and set apart to them as between the parties thereto, and said part thus designated and set apart to second parties shall be kept and held by the said then holders thereof, in escrow, for the use and benefit of the second parties, subject alone to said pledge, it being agreed that the said holders thereof at the time shall first exhaust the interest of the first party in any such notes thus pledged before resorting to the interest therein of the second parties, and both parties agree to join in an application to have some bank in Beeville made depository for all said notes, and hold same according to the terms of this agreement.

"(B) When the debt for which said notes may be pledged at the time of such settlement has been fully paid off and discharged, then that amount of said notes designated and set apart for second parties shall be delivered by the holder thereof to said second parties, and to no one else, and the second party shall have the benefit of all interest accruing on said notes thus designated and set apart to them in any such settlement, and first party shall be entitled to all interest due on the notes not set

apart to second parties. It is further understood that first party shall pay all interests due by him to the owners of the land on any obligations created by him under this contract with them.

"(5) The first party agrees to hereafter advance second parties $800.00 per month, beginning April 1, 1909, for and during the next succeeding three months, payable monthly, and which sums thus hereafter advanced, together with the sum not exceeding $3,500.00 heretofore advanced by first party to second party, shall be paid to the first party, by the second parties, at San Antonio, Tex., in the following manner: Fifty cents per acre on each acre sold, except land sold during July and August, 1909 (except ten-acre tracts), as fast as deeds are delivered, shall be deducted from the $1.75 per acre out of the first cash payment by purchasers allowed second parties for expenses, as hereinbefore provided and paid first party, until said $2,400.00, together with the amount not to exceed $3,500.00 heretofore advanced, with interest thereon at 7 per cent. per annum, has been fully paid off and discharged: Provided, however, such payment shall not in any case exceed an amount which will reduce the amount going for expenses to second party on any sale below $1.25 per acre. Should any such payment to first party be less than 50 cents per acre on any sale, it shall be made up to first party on subsequent sales in which there is sufficient surplus over $1.75 per acre to protect same.

"(6) It is further agreed that, if by January 1, 1910, the second parties have not sold or contracted to sell such reasonable number of acres of said land as to satisfy the first party, he shall have the option to cancel and vacate this contract. * * *

"(9) This contract shall continue and be in force until the 1st day of July, 1910, unless previously canceled and terminated under the provisions hereof, but no longer. * * *

"(12) If this contract shall become vacated and canceled at any time, then any settlement as between the parties shall be based on the number of acres of land sold under the terms of this contract by second parties to date of cancellation of same, and no liability shall rest against either party in favor of the other on account of any part of said lands which may remain unsold at the time.

"(13) Triplicate contracts of purchase shall be made by second parties, one to purchaser, one to Plummer, and keep one, until consummation of the trade. All earnest money collected on said contracts shall be immediately deposited with a bank or trust company in San Antonio, Tex., to be agreed upon, in trust for all parties concerned in this contract. Should any prospective purchaser fail to complete his contract, all earnest money held to secure said contract upon his failure shall be divided into three parts, one-third (⅓) to the agent making such sale, one-third (⅓) each to the first and second parties, and in such proportions at once disbursed by the parties.

"(14) It is agreed and understood that this contract shall cover all sales and contracts of sales made from said eighteen thousand seven hundred and twenty and 5-10 acre tract before the signing of this agreement, and when this agreement shall have been executed all earnest money, cash, and notes held by second parties shall be deposited in accordance with terms of this agreement as to lands to be hereafter sold.

"(15) Expense of maintaining an office at San Antonio shall not be chargeable as an item of expense on final settlement had between parties herein.

"(16) No obligation shall, under any circumstances, rest upon the first party, or any liability arise against him, for any act or thing done by the second parties, outside of the scope of this contract, and it is distinctly understood between these contracting parties, and all sub-agents acting under the second parties shall take notice of the fact, that the party of the first part shall not be liable to second parties, nor to any other person in any event, for commissions on the sale or proposed sales of any of said lands or for any expenses or other claims or demands whatsoever, except as herein provided, and all contracts made between second parties and any other persons shall be made to conform to the terms and conditions of this contract so far as the first party is concerned.

"(17) Second party agrees to operate and advertise for sale said land under the trade name of 'Simms Colonization Company,' a copartnership composed of second parties.

"(18) This contract shall not be varied by either party, except in writing, signed by them. This contract is made in lieu of, and to take the place of, said contract dated September 17, 1908, and supplement thereto of January 28, 1909.

"(19) The death or disability of W. M. Sims shall terminate this contract at once.

"(20) Each party hereto shall have a lien on all interest of the other party in this contract, and all proceeds arising therefrom, to satisfy any indebtedness due by one to the other under the terms hereof."

The seventh clause of the contract made June 10, 1909, in regard to the sale of the Word section of 640 acres is as follows:

"(7) First party shall have the option to cancel this contract on January 1, 1910, provided second parties have not, previous to said date, sold a quantity of said land sufficient to satisfy first party, and, in case of such cancellation, a settlement to be then made between the parties on the basis of the terms hereof as to all said land sold by second parties prior to said cancellation, and further than such a settlement no liability to rest against either party in favor of the other on account of said cancellation."

There was no error in the court's refusal to charge the jury to find for the defendant. The contract provides that the proceeds of sales of the land in the shape of notes shall be placed in some bank in Beeville, to be held in trust; and, while Plummer is given the right to place said notes with the Lotts as collateral security for the purchase money of the land, he is not given the right to dispose of appellee's interest therein. Each party having an interest in these notes, the mere privilege is extended appellant to place them as collateral security. He is not given the right to sell appellees' interest therein, and when he does sell same and pay his own debt with that interest in the notes he converts that interest to his own use and benefit. Instead of preserving the interest of appellees in the notes, appellant sold same or applied the whole of the notes in settlement of his own debt, which is a final disposition of the same. This assignment is overruled. Russell v. Deutschman, 100 S. W. 1164; Oliver v. Piatt, 44 U. S. (3 How.) 401, 11 L. Ed. 622; S. A. Nat. Bank v. Blocker et al., 77 Tex. 73, 13 S. W. 961; Hardie v. Wright, 83 Tex. 345, 18 S. W. 615; Marberry v. Bank, 6 Tex. Civ. App. 607, 26 S. W. 215.

The evidence shows that appellant disposed of all the notes received, and it is really immaterial whether the original purchase-money debt for the land was paid or merely

transferred to the Central Trust Company, because Plummer said himself:

"The sale of the land was so slow money was not provided to meet the interest and make payment on my notes as they became due; therefore I was obliged to sell these notes as soon as they became marketable to meet the interest that was due and past due on my notes, and the money was applied and credited on my notes."

Subdivision 15 of the contract provided that the Lotts should keep all notes until Plummer had paid his obligation to them in full, and, while this would give the Lotts the right to hold the proceeds until their debt was paid, and appellees would be bound by that as a part of their sales contract, it would not give appellant the right to sell appellees' interest in said notes, nor would it relieve him from the duty of accounting therefor in a final settlement after he had sold them.

[1, 2] Clauses 3 and 4 of the contract provide for the distribution of the money, etc., and a full and complete settlement in case the contract of sale runs its full term and is carried out. But a provision was also incorporated in paragraph 12 giving appellant the right to cancel the contract January 1, 1910, and that right he exercised; consequently the question arises as to what the intention of the parties was as to how the items of expense were to be divided in the event of such cancellation. Testimony explaining this intention would not vary the provisions of paragraphs on subdivision 1, 2, and 3 of section B of the third paragraph of the contract, because those subdivisions deal with a completed contract where its terms have been carried out by the sale of the land or the running the full term of the contract. The question here at issue was: Did the parties intend by paragraph 12 of the contract to provide that in the event the contract was canceled that the expenses referred to in paragraph 3 should be prorated on the basis of the number of acres sold? Paragraph 3 says that on final settlement these expenses shall be borne equally, and that is where the contract expires by its terms or is fulfilled by the sale of all the land. Paragraph 12 must have meant a different method of settlement than in 3, because, if such were not its purpose, it would be useless. It occurs to us that the meaning of paragraph 12 is that any settlement growing out of a cancellation of the contract should be based on the number of acres sold; but this meaning cannot be said to be so certain as to preclude the necessity of submitting it to the jury to determine what the intention of the parties were as to such expenses. The objections, however, to the testimony were not well taken, because it was merely for the purpose of explaining what was meant by the parties when that clause was put in the contract, meaning of the writing not being certain. This is not varying the terms of paragraphs 3 and 4, because they deal with a contract whose terms have been fulfilled, and this

177 S.W.—66

paragraph deals with another subject entirely. And, where a part of a contract is ambiguous, it is not error for the court to submit to the jury to determine what the intention of the parties was. The court did not err in submitting that matter to the jury, and the second assignment is overruled. Arlington Heights Realty Co. v. Light Co., 160 S. W. 1109; Railway v. Anderson, 36 Tex. Civ. App. 121, 81 S. W. 781; Nalle v. McKnight, 126 S. W. 902; Feigelson v. Brown, 126 S. W. 17; Ginnuth v. Blake Co., 28 S. W. 828.

The third assignment is disposed of by what we have already said, and the same is overruled.

The court did not err in refusing appellant's special charge No. 5, because the settlements provided in paragraphs 3 and 4 had reference to the completion of the contract or the expiration of the same under the time limit. The contract was canceled, and it therefore became necessary to adjust the rights of the parties as provided in the twelfth paragraph. The fourth assignment is overruled.

The fifth to seventh assignments, both inclusive, relate to the introduction of testimony as to the intention of the parties or meaning of clause 12, and they are overruled for the reasons already given. If it was not error to submit that issue to the jury, certainly it was not error to admit the evidence on that issue.

[3] The eighth assignment complains that the evidence does not show that the contract for the Word section was canceled before its expiration by its own terms, and therefore there is no basis for prorating the expenses, advances, etc., on account of that land. The plaintiff's petition charged that both contracts were canceled January 1, 1910, and defendant's answer does not deny this. Further, appellant, answering paragraph 5 of the petition, denies that at the time of the cancellation of said contracts aforesaid Simms, Harrison & Simms had made sales of said land, and says the sales were made by the Simms Colonization Company. It seems to have been undisputed that both contracts were canceled. Where the petition charges that both contracts were canceled, and this is not denied, proof on that matter is entirely unnecessary. The assignment is overruled.

[4] The contract (thirteenth clause) provided that forfeit money on sales that were not completed should be divided, one-third to subagent making the sale, and one-third each to the contracting parties (appellant and appellees). Appellant requested a charge to the effect that in determining the number of acres sold the jury should take into account the number of acres contracted to be sold upon which earnest money was collected. Appellant received his one-third of that money, the distribution of which was governed by said thirteenth paragraph, and, of course, he

still had his land. In the event of such forfeit money, the parties had fixed their own measure of adjustment by providing for the distribution of the forfeit money. The ninth assignment is overruled; and the tenth and eleventh assignments, being without merit, are also overruled.

[5] The twelfth assignment assails the action of the court in refusing to give appellant's requested special charge No. 4, to the effect that if Simms, Harrison & Simms had assigned their contract to the Simms Colonization Company, a Kansas corporation, before the service was performed, and that corporation accepted the contract and undertook to carry it out, and it had not obtained a permit to do business in Texas, to find for the defendant. There was what was known as the Simms Colonization Company, a corporation chartered under the laws of Missouri, of which appellant was president. In making the contract with appellees, or with Wm. Simms, appellant stipulated that they were to do business under the name of Simms Colonization Company, and business was done under that name. The appellees all testified positively that the contract was not assigned to the Simms Colonization Company of Kansas, but stated that they did organize said corporation, and expected to pay for their stock therein out of what they realized out of this sales contract. They further say that the corporation never undertook to carry out the contract of sale at all. These parties, together with J. J. Harrison's wife and D. F. Bowman, owned all of the stock in the corporation. This corporation was not organized until about October, 1909, and Harrison said:

"We expected to go ahead, after the sale of this land was over, with the corporation. That is what the corporation was intended for, to get another piece of land, buy it, and go ahead and sell it. The contract made with Mr. Plummer provides that Simms, Harrison & Simms were to devote their exclusive time and attention to the sale of the Lott lands."

In paragraph 17 it is provided that the land should be advertised for sale under the name of Simms Colonization Company, and paragraph 19 provides that the death or disability of W. M. Simms should terminate the contract. It is true some of the correspondence with appellant was on the letter heads of, and signed by, the corporation, but appellant says he made no contract with the corporation and did not recognize the same. Some of the checks given were indorsed by Simms, Harrison & Simms to the corporation. This, however, is in line with their uncontradicted statements that they were paying for their stock out of what they made out of the sale of the Lott lands. It is absolutely immaterial, though, what they did with the money they made out of the Lott lands, so long as the corporation itself was not doing business in Texas in handling this land. In view of appellees' positive testimony that they did not assign the contract, and the further requirement of the contract that Simms, Harrison & Simms do business in advertising these lands under the trade-name of Simms Colonization Company, and in the absence of any evidence of an assignment of a positive nature, we do not think the charge would have been justified. Furthermore, the auditor's report was not excepted to because it improperly states an account between appellant and Simms, Harrison & Simms, or on the ground that there was no money due and owing that firm because of the alleged assignment of the contract. The assignment is overruled. St. Louis, etc., Ry. Co. v. Freedman, 18 Tex. Civ. App. 553, 46 S. W. 101; Galveston, etc., Ry. Co. v. Noelke, 110 S. W. 82; El Paso, etc., Ry. Co. v. Harris & Liebman, 110 S. W. 145.

On the whole, it appears that the case was fully developed and fairly tried, and we are not disposed to disturb the judgment, and it is in all things affirmed.

## On Motion for Rehearing.

[6] Appellants in their motion for rehearing contend that we erred in holding that the sale by Plummer of appellees' interest in the notes deposited with the Lotts as collateral constituted conversion. This holding was made in considering the assignment of error complaining of the refusal of the court to give a peremptory instruction requiring the jury to return a general verdict in favor of defendant. This request was not made on the theory that defendant was not indebted to plaintiffs, for there can be no doubt in regard to that matter. The main controversy was in regard to the amount of the indebtedness, but defendant also pleaded that he had never paid off the debt due by him to the Lotts, and therefore the plaintiffs should not be permitted to collect their portion of the proceeds of the notes deposited as collateral. Defendant did not ask the court to dismiss plaintiffs' case because the suit was prematurely brought, but, without assigning any reasons, asked the court to instruct a verdict upon which a judgment upon the merits would have been rendered in favor of defendant. The court refused this request, and in the motion for new trial defendant contended the request should have been granted on the ground that the suit was prematurely brought. Plaintiffs pleaded that defendant's sale of the plaintiffs' interest in the notes deposited as collateral pursuant to the Lott contract, which sale was made without their knowledge or consent, and the appropriation of the proceeds to defendant's benefit by applying the same to the payment of his debt to the Lotts, constituted a conversion of such interest in said notes, but plaintiffs also pleaded the contract. Therefore, if under the terms of the contract and the facts proven plaintiff was entitled to collect his debt at the date of the judgment, it is immaterial whether defendant's acts constituted conversion.

One of the clauses of the Lott-Plummer contract referred to in the original opinion provides that after Plummer has paid $30,000 of the purchase money a deed will be made him, retaining a vendor's lien to secure the payment of five promissory notes by Plummer to the Lotts, one for $20,000, payable on or before 15 months from December 10, 1908, one for $18,641.85, payable on or before 18 months from December 10, 1908, one for $45,761.20, payable on or before 30 months from December 10, 1908, one for $45,761.20, payable on or before 42 months from December 10, 1908, and one for $45,761.20, payable on or before 54 months from December 10, 1908. Plummer is given the privilege of having released from the vendor's lien retained in such deed tracts and subdivisions of land upon certain conditions, one of which is that the vendor's lien notes given Plummer by the purchasers shall have been indorsed and delivered to the Lotts as collateral to secure the payment of the five purchase-money notes given by Plummer to the Lotts. The contract also provides as follows:

"All payments of principal or interest made on all purchase-money notes received by Plummer for tracts of the land sold by him to third parties, and which said notes have been theretofore indorsed by him to said first parties as collateral as provided in subdivision 9 hereof shall be retained by first parties, who shall receipt for said payments to the party paying same, and the same shall be credited by them on such notes. The first parties shall also at the same time receipt Plummer for same and credit same as payment on Plummer's purchase-money obligations to them, then maturing next after twelve months from December 10, 1908."

The contract between Plummer and the Lotts is made a part of the contract between Plummer and Simms, Harrison & Simms, and said last-mentioned contract provides that sales of land except those of ten-acre tracts shall be made as provided in the Lott contract, and provides, further, that at the expiration of the contract there shall be a complete settlement between the parties, and, if any purchase-money notes then remain pledged to secure Plummer's debt to Lott, the share and interest of Simms, Harrison & Simms therein shall be designated and set apart to them, and shall be kept by the holders thereof in escrow, subject only to the pledge, and with the understanding that Plummer's interest in such pledged notes shall be first exhausted if the collateral is subjected to payment of Plummer's debt; that, when the debt for which said notes may be pledged at the time of such settlement has been fully paid off and discharged, then that amount of said notes designated and set apart for Simms, Harrison & Simms shall be delivered by the holder thereof to them, and they shall have the benefit of all interest accruing thereon. The contract was terminated by Plummer on January 1, 1910, under the option given him in paragraph 6 of the contract between him and Simms, Harrison & Simms. No settlement and designation of the interest of Simms, Harrison & Simms, in the notes ever took place. There was a direct conflict in the testimony on the point whether a request was made that Plummer should designate and set apart said notes. The record shows that a deed was made by the Lotts to Plummer, and, while the testimony is not clear, we construe it as showing that such deed was not executed until about February 25, 1910. Nothing is said about the notes, so we assume they were as called for in the contract. When the purchasers had paid the first of the three notes, Plummer was able to sell the remaining notes, and did so without the consent or knowledge of Simms, Harrison & Simms, the proceeds being credited upon his notes to the Lotts. He did this because sales were so slow that money was not provided to pay the interest and the notes when due. It was admitted that the Lotts have been fully paid through a loan negotiated by Plummer with the Central Trust Company. Plummer testified:

"The Lotts have been paid, but the debt was transferred and has not been paid by me."

The date when this occurred is not shown.

If the deed and notes from the Lotts to Plummer were executed according to the terms of the contract, and we must presume they were, the last note from Plummer to the Lotts matured 54 months after December 10, 1908; that is, on June 10, 1913. This suit was filed on May 6, 1913, but no tender of the amount due was made by defendant, and the judgment was rendered on May 8, 1914, about 11 months after the last note to the Lotts became due.

The contract between Plummer and Simms, Harrison & Simms was drawn with the view of protecting the rights of the Lotts under the other contract, and it was therefore provided that Simms, Harrison & Simms could not get their part of the notes until the Lott debt was paid off. It was the intention of the parties to show clearly that no demand for a half interest in notes could be enforced so long as such notes were deposited as collateral for the benefit of the Lotts. No provision was made to the effect that Simms, Harrison & Simms could not collect from Plummer their half of such notes as should be paid, even though the proceeds thereof had been applied by the Lotts to the payment of Plummer's debt to them. Therefore, had the settlement been made as provided in the contract, plaintiffs would have received their part of the proceeds of notes which had been paid, but their interest in the unpaid notes would have been merely designated and set apart, "subject alone to said pledge," as is stated in the contract. No settlement was made, and plaintiffs were forced to seek one in the courts. At the time the court compelled a settlement no notes were on hand, and therefore there was nothing "subject alone to said pledge." Plummer had voluntarily changed the situation so that the proceeds of the notes had answered the same purpose as

if the notes had been collected. Thereby he deprived 'plaintiffs of their right to interest on their part of the notes, for which he would be answerable, but otherwise the transaction had the same effect as if the notes had been paid. In addition, it is to be noted that at the time the court by its judgment made the settlement between the parties all of the notes would have been paid, if paid at their maturity, and Plummer, having sold the notes cannot be heard to say that perchance some of them might not have been paid when due, and might still have been collateral had he not sold them. We believe there is no provision of the contract which postpones until the payment of the Lott debt, the collection by plaintiffs of their half of the proceeds of notes paid or sold. But, if such collection should be held to be postponed to the time when the Lott debt shall have been paid, we think that Plummer could not be permitted to take advantage of his failure to pay the Lott indebtedness when it matured, and, by getting some one else to carry it, keep plaintiffs from having a settlement until such time as suits his convenience. The parties contemplated that Plummer would pay his notes when due, and, while the Lotts could keep the proceeds of notes, or hold the notes themselves if not paid or sold, when their rights no longer interfere, Plummer cannot take advantage of rights they might have had in the notes had he not sold them. The judgment was rendered 11 months after the last note to the Lotts would have been paid off had Plummer complied with his contract, and he cannot be heard to say that the time has not yet arrived when he should pay plaintiffs. We conclude that, aside from the issue of conversion, there is no merit in the first assignment of error.

The motion for rehearing is overruled.